**SIERRA CLUB, et al., Plaintiffs,**

v.

**John O. MARSH, Jr., et al., Defendants.**

Civ. No. 88–0116–B.

United States District Court, D. Maine.

May 30, 1989.

Edward F. Lawson, Weston, Patrick, Willard & Redding, Boston, Mass., and Tybe A. Brett, Portland, Me., for plaintiffs.

Michael M. DuBose, Asst. U.S. Atty., Bangor, Me., Thomas G. Reeves, Chief Counsel, Legal Div., Maine Dept. of

Transp., Augusta, Me., John Quarles, Anthony C. Roth, Leslie S. Ritts, and Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., for defendants.

## MEMORANDUM OF DECISION ON RECONSIDERATION FOLLOWING REMAND

CYR, Chief Judge.

Plaintiffs, Sierra Club and two of its members, request declaratory and injunctive relief halting Maine Department of Transportation's [MDOT's] construction of a marine dry cargo terminal on the western shore of Sears Island in Upper Penobscot Bay. Plaintiffs contend that construction permits issued by the Army Corps of Engineers [the Corps] and by the United States Coast Guard [the Coast Guard], as well as Federal Highway Administration [FHwA] funding of the project, must be suspended due to failure to comply with the Clean Water Act [CWA], 33 U.S.C. § 1251 *et seq.,* the National Environmental Policy Act [NEPA], 42 U.S.C. § 4321 *et seq.,* and section 9 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401.

In *Sierra Club v. Marsh,* 872 F.2d 497 (1st Cir.1989) [*Sierra Club III*], the United States Court of Appeals for the First Circuit vacated an order of this court, *see Sierra Club v. Marsh,* 701 F.Supp. 886 (D.Me.1988), which had declined to enjoin the construction of a causeway to Sears Island and the resumption of harbor dredging in the area of the proposed terminal. On remand pursuant to the mandate of the United States Court of Appeals for the First Circuit, the court reconsiders plaintiffs' motion for preliminary injunctive re-

lief insofar as it is predicated on their NEPA claims.

## I. BACKGROUND [1]

*Sierra Club v. Marsh,* 701 F.Supp. 886 (D.Me.1988), employed the four-part test traditionally required in the First Circuit upon consideration of a request for preliminary injunctive relief: (1) would plaintiffs suffer irreparable harm if the injunction is not granted; (2) would the harm to the plaintiffs outweigh any harm that injunctive relief would cause the defendants; (3) have plaintiffs demonstrated a likelihood of success on the merits; and (4) would an injunction be in the public interest. *See Sierra Club,* 701 F.Supp. at 894 (quoting *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981).

The court found that there had been no demonstration of irreparable harm likely to result from construction of the causeway or dredging of the harbor at the site of the proposed terminal,[2] that the balance of harms favored the defendants and that the public interest would be better served by allowing causeway construction and harbor dredging to proceed pending a decision on the merits.

The court further determined that, even if it were made to appear that the plaintiffs were likely to succeed on the merits of their NEPA claims, a likelihood of irreparable *physical* harm to the environment would have to be demonstrated in order to obtain preliminary injunctive relief. *Sierra Club,* 701 F.Supp. at 899. Since plaintiffs did not demonstrate that "removal of the causeway [was] either impracticable or that it would not restore the environmental status quo," or that restoration of habitats destroyed by dredging would be impracticable, the court found that the plaintiffs had

---

**1.** The court summarizes the procedural history of the case following the entry of its order denying plaintiffs' motion for a preliminary injunction on September 30, 1988. For a complete description of the earlier background and procedural history, see *Sierra Club,* 701 F.Supp. at 890–894.

**2.** At the time plaintiffs filed their motion for preliminary injunctive relief, only the construction of the causeway and dredging of the harbor

appeared imminent. *See Sierra Club,* 701 F.Supp. at 897. On March 8, 1989, MDOT advised the plaintiffs and the court that since causeway construction and harbor dredging were substantially complete, MDOT planned to begin the next phases: construction of a 500' pier access road and construction of eleven pier cells forming the seaward side of the marginal wharf. Ltr. from Thomas Reeves, MDOT Chief Counsel to Clerk, March 8, 1989.

failed to demonstrate irreparable environmental harm in the absence of an injunction. 701 F.Supp. at 898.

The court recognized that its decision did not give effect to *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983). *See Sierra Club*, 701 F.Supp. at 894–897. *Watt* had held that

> the harm at stake [from a NEPA violation] is a harm to the *environment*, but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment.

*Sierra Club III*, at 500 (emphasis in original). *Sierra Club III* held that

> NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (*when the law permits*) are less likely to tear down a nearly completed project than a barely started project. In *Watt* we simply held that *the district court should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary injunction.*

*Sierra Club III*, at 500 (emphasis added). Relying on *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), this court held that a violation of NEPA procedure, "without more, raises no presumption of irreparable injury, nor does it diminish the need to determine the likelihood of irreparable environmental harm in the absence of preliminary injunctive relief." *Sierra Club*, 701 F.Supp. at 897.

On appeal from this court's decision in *Sierra Club*, 701 F.Supp. 886 (D.Me.1988), the First Circuit reaffirmed its holding in *Watt*: "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the *harm* that NEPA in-

tends to prevent has been suffered." *Sierra Club III*, at 500 (quoting *Watt*, 716 F.2d at 952) (emphasis added).[3]

A district court, when considering a request for a preliminary injunction, must realize the important fact of administrative life that we described in *Watt*: as time goes on, it will become ever more difficult to undo an improper decision (a decision that, in the presence of adequate environmental information, might have come out differently). The relevant agencies and the relevant interest groups (suppliers, workers, potential customers, local officials, neighborhoods) may become ever more committed to the action initially chosen.

*Id.* at 503. The First Circuit cautioned that by recognizing "this harm and its potentially 'irreparable' nature" it was not creating a "special 'presumption' in favor of injunctions," indeed the "*balance* of harms" could "point the other way" in a particular case. *Id.* at 503–04 (quoting *Watt*, 716 F.2d at 952 (emphasis in original)).

The First Circuit distinguished *Watt* from *Village of Gambell* on the basis of certain differences between the two statutes being considered in those cases: "the kinds of 'harms' that are relevant, and that may be 'irreparable,' will be different according to each statute's structure and purpose." *Sierra Club III*, at 502 (citing *Village of Gambell*, 480 U.S. at 543 n. 9, 107 S.Ct. at 1403 n. 9; *Watt*, 716 F.2d at 952). Although "[b]oth NEPA and ANILCA are 'procedural' statutes in the sense that both set forth procedures that decisionmakers must follow before taking an action that might harm the environment (or 'subsistence uses')," *Sierra Club III*, at 502, the First Circuit noted that ANILCA contains substantive standards as well, *id.* at 502, whereas NEPA itself does not, *id.* at 502. Under ANILCA, "[s]hould an agency head choose a course of action that, for example, takes from subsistence uses more than the 'minimal amount of public lands' necessary for the alternative public purposes ...,

---

**3.** Elsewhere, the First Circuit stated that "the *risk* implied by a violation of NEPA is that real environmental harm will occur through inade-

quate foresight and deliberation." *Sierra Club III*, at 504 (emphasis added).

ANILCA requires him to change the action." *Id.* at 502. Whereas, although "NEPA demands that a decisionmaker consider all significant environmental impacts before choosing a course of action," *id.* at 502, once the NEPA *process* has been followed NEPA itself imposes no constraints upon the agency's power to permit the project notwithstanding its adverse environmental effects, *id.* at 502.

This difference between NEPA and ANILCA is "critical for present purposes," *id.* at 501, because "[i]nsofar as a procedural failure leads to an improper choice, a court, *under ANILCA but not under NEPA,* may require the decisionmaker to choose a new action; and this fact may make the ANILCA [procedural] failure *'reparable harm,'*" *id.* at 503 (emphasis in original). As agency decisionmakers may not be compelled, under NEPA itself, to choose the less environmentally injurious course of action, the First Circuit ruled that "[t]he difficulty of stopping a bureaucratic steam roller, once started, ... [is] a perfectly

proper factor for a district court to take into account in assessing" a motion for preliminary injunctive relief. *Id.* at 504.[4]

In *Sierra Club III,* the First Circuit reiterated, *see also Massachusetts v. Watt,* 716 F.2d 946 (1st Cir.1983), that NEPA "seeks to create a particular bureaucratic decision-making process, ... whereby administrators make important decisions with an informed awareness of how the decision might significantly affect the environment," *Sierra Club III,* at 497, and the court went on to say: "if any such decision is made without the information that NEPA seeks to put before the decisionmaker, the harm that NEPA seeks to prevent occurs," *id.* (citing *Watt,* 716 F.2d at 952). Upon revisiting *Watt,* the First Circuit offered further explanation.

[T]he harm at stake is a harm to the *environment,* but the harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without

**4.** The most substantial environmental challenge to the Sears Island project is that Mack Point, the nearby site of an existing bulk cargo terminal, is a practicable alternative site for the proposed dry cargo terminal which would entail less risk of irreparable environmental injury of the kind cognizable under the Clean Water Act. Of course, if it were to be shown that there is a likelihood that plaintiffs are likely to succeed on their CWA claim, preliminary injunctive relief would be in order.

Although this court's earlier decision described the nature of the CWA claim, *see Sierra Club v. Marsh,* 701 F.Supp. at 910–913, there is no indication in *Sierra Club III* that the First Circuit considered the import of the CWA claim as it bears upon the *Watt–Village of Gambell* analysis in *Sierra Club III.* Yet the pendency of a substantive CWA claim would appear to bear importantly upon the *Watt–Village of Gambell* analysis in *Sierra Club III,* where *Gambell* was distinguished solely on the ground that it involved ANILCA, which has both a procedural and a substantive component, whereas NEPA is strictly procedural.

It is not clear that *Sierra Club III* considered that NEPA interfaces in the present action with a substantive environmental statute, albeit a separate one, i.e., the CWA, in a manner which is difficult to distinguish from the interplay between ANILCA's procedural and substantive components. The present quaere is significant inasmuch as the holding in *Sierra Club III,* i.e., that *Watt* survives *Gambell,* is predicated entirely on the ground that *Watt* involved a NEPA

violation with respect to which the court would be left powerless to compel substantive compliance by the agency. The matter presently under discussion is particularly significant in view of the fact that the First Circuit was careful to note repeatedly that its concern about risk of harm to the environment caused by bureaucratic commitment resulting from uninformed decisionmaking was restricted (as it must be) to instances in which the agency decision, uninformed or otherwise, is *not constrained* by substantive environmental standards (such as ANILCA contains). *See, e.g., Sierra Club III,* at 500 ("NEPA's object is to minimize ... the risk of uniformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (*when the law permits*) are less likely to tear down a nearly completed project than a barely started project.") (emphasis added); *id.* at 502–503 ("... NEPA does not tell the decisionmaker what course of action he must choose.... ANILCA, on the other hand, contains a 'substantive' standard as well.... [S]hould [an agency head] fail ... to minimize adverse impacts ... ANILCA requires him to change the action."); *id.* at 502 (*Watt,* 716 F.2d at 952 (*distinguishing the Clean Water Act, which was construed in Romero–Barcelo, from NEPA*) (emphasis added)); *id.* at 503 ("Insofar as a procedural failure leads to an improper choice, a court, *under ANILCA but not under NEPA*) may require the decisionmaker to choose a new action; and this fact may make the ANILCA failure *'reparable* harm.'" (emphasis in original). *See* note 68 *infra.*

having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project. In *Watt* we simply held that the district court should take account of the potentially irreparable nature of this decisionmaking risk to the environment when considering a request for preliminary injunction.

*Id.* at 500–01 (emphasis in original).

## II. DISCUSSION

The court views its mandate on remand as requiring reconsideration of preliminary injunctive relief in the light of the following constraints. A NEPA violation which deprives agency decisionmakers of an informed awareness of significant environmental consequences of the challenged action is *deemed* harmful to the environment, by virtue "of the added *risk* to the environment," *id.* at 500–01 (emphasis in original), "that arises in part from the practical *fact* that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely

started project," *id.* (emphasis added). The district court is to "take account of the *potentially* irreparable nature of this *decisionmaking risk* to the environment when considering a request for preliminary injunction." *Id.* (emphasis added).

The court broaches the following specific inquiries:

(i) Are plaintiffs likely to succeed on the merits of a NEPA claim?

(ii) Did a NEPA violation deprive agency decisionmakers of information, analysis or comment necessary to an informed awareness of the environmental effects of their decision? [5]

(iii) Does any bureaucratic commitment [6] resulting from an uninformed choice constitute irreparable harm? [7]

The ultimate harm NEPA seeks to prevent is the real environmental harm which may occur as a result of inadequate foresight and deliberation by agency decisionmakers. *Sierra Club III*, at 504. First, plaintiffs must demonstrate a probable NEPA violation which led agency decisionmakers to "make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment." *Id.* at 500. *Accord Enos v. Marsh*, 616

---

5. If (i) and (ii) are satisfied, environmental harm is deemed to have occurred. *See Sierra Club III,* at 497, 500.

6. The court does not attempt to evaluate whether actual agency bias favoring development of the Sears Island project resulted from (or, perhaps, preceded) earlier administrative failures to comply with NEPA, such as the failure to prepare any EIS at all. *See Sierra Club I,* 769 F.2d 868, 881–82. The focus of the present inquiry is less upon whether, or how considerable, an agency bias has resulted from any extant deficiency in NEPA compliance, than upon whether any such agency bias, *assuming* its existence (which the court considers virtually impossible of ascertainment on the administrative record alone), bears a causal connection to a demonstrated likelihood of irreparable injury. *Cf. Metropolitan Edison Co. v. People Against Nuclear Energy,* 460 U.S. 766, 779, 103 S.Ct. 1556, 1563, 75 L.Ed.2d 534 (1983) ("NEPA is not directed at the effects of past accidents and does not create a remedial scheme for past federal actions. It was enacted to require agencies to assess the future effects of future actions.")

7. Part (iii) may involve three subsidiary inquiries: (a) the likelihood of irreparable physical harm to the environment in the absence of a preliminary injunction; (b) the likelihood that the NEPA violation led to an insufficiently informed agency decision which "the law permits," *see Sierra Club III,* at 500 (parentheses omitted), the agency to make in its unconstrained discretion; that is, with respect to which the court "cannot force the agency to choose a new course of action," *id.* at 503; (c) in light of all of the circumstances, including all earlier proceedings relating to the challenged project, does it appear *more likely* that recourse to the NEPA process would "prove an exercise in futility," *Sierra Club III,* at 503, in the sense that it might bring "about a new choice," *id.,* fairly arrived at in light of the newly-obtained information, analysis and/or comment, *if* the project is *not enjoined, than* would be the case if the project *is enjoined, while recourse is had to the NEPA process?*

F.Supp. 32, 37 (D.C.Hawaii 1984) ("Although there may be a technical violation of procedural requirements, an injunction will not necessarily issue if the decision maker is otherwise fully informed as to the environmental consequences of the proposed action.") *Cf. Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023 (9th Cir.1980) (no harm resulted from failure to provide particular agency with copy of DEIS for comment, where result would be to lead Corps to "institute a study it has already completed and fully considered"). Second, since no presumption arises in favor of injunctive relief merely because plaintiffs demonstrate a probable NEPA violation, *see Sierra Club III,* at 503, and all traditional equitable standards remain applicable, *see Village of Gambell,* 480 U.S. at 545, 107 S.Ct. at 1404; *Save the Yaak Committee v. Block,* 840 F.2d 714, 722 (9th Cir.1988), plaintiffs must demonstrate a likelihood of irreparable harm if construction is not enjoined pending a decision on the merits, *see Sierra Club III,* at 504; *Northern Cheyenne Tribe v. Hodel,* 851 F.2d 1152, 1156–57 (9th Cir.1988) (upholding decision to suspend rather than void oil leases; on the ground that plaintiffs did not demonstrate that mere suspension could lead to bureaucratic commitment), either in the form of real harm to the environment *or* a risk of real harm to the environment resulting from a bureaucratic commitment to the challenged project predicated on an uninformed agency decision.

Should it appear that plaintiffs are likely to prevail on the merits of a NEPA claim and that the requisite causal connection exists between the NEPA violation and a resulting bureaucratic bias in favor of the challenged project, the court is required to "take account of [the] harm," *Sierra Club III,* at 504, which "inadequately informed decisionmaking," *id.,* can pose to the environment, as well as "its potentially 'irreparable' nature," *id.* " 'This is not to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way.' " *Id.* at 504 (quoting *Watt,* 716 F.2d at 952) (emphasis in original). Employing " 'traditional'

equity standards," *id.* at 503, the court must balance any irreparable harm that an injunction would cause the defendants against any irreparable harm causally connected to any uninformed agency decision flowing from a NEPA violation.

Accordingly, the court first determines whether plaintiffs have established a likelihood of success on their NEPA claims. Next, the court inquires whether any NEPA violation appears to have led to inadequate agency awareness or consideration of any significant environmental consequence of permitting the project, and, if so, whether there is a clear risk of bureaucratic commitment to the project absent an injunction. The court then must identify any irreparable harm to the defendants should the project be enjoined and compare that irreparable harm with any irreparable harm causally connected to a NEPA violation. Finally, the court must consider whether the public interest will be better served by granting or withholding preliminary injunctive relief.

A. *Likelihood of Success on Merits of NEPA Claims*

NEPA requires federal agencies to prepare a " 'detailed statement ... on the environmental impact' of any proposed major federal action 'significantly affecting the environment.' " *Sierra Club v. Marsh,* 769 F.2d 868, 870 (1st Cir.1985) [*Sierra Club I* ]. The environmental impact statement [EIS] required by NEPA is an "action-forcing" device intended to serve at least three purposes:

First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must "explicate fully its course of inquiry, its analysis and its reasoning." Second, it serves as an environmental full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project.

. . . .

[Therefore,] [i]t cannot be composed of statements "too vague, too general and

too conclusory." ... [Third,] and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues, but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." ... Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.

*Sierra Club*, 701 F.Supp. at 913–14 (quoting *Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir.1973)).

*Sierra Club I* held that the reasonably foreseeable secondary impacts of a dry cargo terminal on Sears Island, together with the environmental effects of terminal construction and operation, were significant enough to necessitate preparation of an EIS. 769 F.2d at 881–82. Plaintiffs contend that the final EIS [FEIS] is inadequate because defendants failed to comply with NEPA and the companion regulations governing EIS content and preparation. Plaintiffs maintain that these NEPA violations, combined with defendants' "track record," demonstrate that the EIS represents a mere rationalization of a decision made long ago, rather than the kind of "good faith consideration" of environmental consequences mandated by NEPA.

[Plaintiffs] allege[ ] that FHWA and the Corps failed to comply with EIS procedures prescribed by NEPA and its companion regulations. Plaintiffs contend that significant additional information regarding the environmental impacts of the Sears Island project—including information that a six-berth facility would require development of 124 acres of upland, rather than the 50 acres stated in the FEIS—was received and relied on subsequent to FHWA approval of the FEIS. Plaintiffs assert that this new information necessitated preparation of a supplemental EIS.

Plaintiffs further allege that FHWA violated NEPA by: (1) responding inadequately to comments on the DEIS; (2) failing to make independent evaluation of the EIS, which was prepared by MDOT's consultants; (3) failing to obtain "conflict of interest" disclosure statements for certain MDOT contractors involved in preparation of the EIS; (4) failing to consider alternative means of providing employment in the Searsport area; (5) failing to give proper consideration to secondary impacts of the project; (6) improperly incorporating key documents by reference; and (7) failing to consider construction of a two-berth facility as an alternative.

The Corps is charged with noncompliance with NEPA by: (1) adopting an FEIS prepared by MDOT; (2) failing to make an independent evaluation of the EIS and of the information submitted by MDOT; (3) basing its permit decision on significant new information not part of the EIS; and (4) relying on studies and analyses conducted after the FEIS had been prepared.

*Sierra Club*, 701 F.Supp. at 893–94.[8]

### 1. Use of Contractors

NEPA's procedures are designed to protect the integrity of the decisionmaking

---

**8.** In its initial discussion of the merits of the NEPA claims, this court noted that plaintiffs, in their memoranda supporting the motion for a preliminary injunction,

> did not pursue their contentions that the FHWA failed to respond adequately to comments on the DEIS, failed to prepare a Supplemental EIS addressing significant new information on the acreage requirements of a

six-berth facility, and improperly incorporated key documents by reference. The plaintiffs failed also to focus on the allegations in the amended complaint that the Corps violated NEPA and its regulations, as well as the CWA, in accepting the FEIS and failing to require a supplemental EIS.

*Sierra Club*, 701 F.Supp. at 915, n. 9. In the three memoranda later filed by plaintiffs on the

process by ensuring that "stubborn problems or serious criticism [are not] swept under the rug." *Silva,* 482 F.2d at 1285. To that end, the regulations [9] governing the selection and use of contractors involved in EIS preparation require that an EIS *"shall* be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency." 40 C.F.R. § 1506.5(c) (emphasis added). The selecting agency must obtain from the outside contractor "a disclosure statement ... specifying that [the contractor has] no financial or other interest in the outcome of the project." *Id.* The intent of these regulations is "to minimize the conflict of interest inherent in the situation of those outside the government coming to the government for money, leases or permits while attempting impartially to analyze the environmental consequences of their getting it." *Sierra Club v. Sigler,* 695 F.2d 957, 963 n. 3 (5th Cir.1983) (quoting 43 Fed.Reg. 55, 987 (1978)). *See* 40 C.F.R. § 1506.5(c) ("It is the intent of these regulations that the contractor be chosen ... to avoid any conflict of interest.")

In the interest of minimizing bias in EIS preparation, the terms "financial or other interest" are to be "broadly [interpreted] to cover any known benefits other than general enhancement of professional reputation." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulation,* 46 Fed.Reg. 18026, 18031 (1981) (CEQ Forty Questions).[10] Firms having an interest in the outcome of the project should be disqualified from participation in the EIS process. 46 Fed.Reg. at 18031. Firms "involved in developing initial data and plans for the project" need not be disqualified, but a disclosure statement in the draft EIS [DEIS] "should clearly state the scope and extent of the firm's prior involvement to expose any potential conflicts of interest that may exist." *Id.* As further protection against bias in EIS preparation, regulations require that the EIS contain a list of the names and qualifications of those "primarily responsible for preparing the [EIS] or significant background papers." 40 C.F.R. § 1502.17.

Although studies and reports prepared by Normandeau Associates, Hunter–Ballew

merits of their motion for summary judgment, and in opposition to defendants' motions for summary judgment, plaintiffs argue only that the FHwA and the Corps erred in not preparing a supplemental EIS. Therefore, the court concludes that plaintiffs have failed to demonstrate a likelihood of success on the merits of their claims that the FHwA failed to respond adequately to comments on the DEIS and improperly incorporated key documents by reference. Because the regulation governing adoption of a FEIS generated by another agency allows adoption only of an EIS which "meets the standards for an adequate statement," 40 C.F.R. § 1506.3(a), the court defers its discussion of plaintiffs' claim that the Corps improperly adopted the FHwA EIS until after its consideration of the alleged inadequacies in the FHwA FEIS.

**9.** In addition to declaring a national environmental policy, 42 U.S.C. § 4321, and prescribing general methods and procedures for implementing the policy, 42 C.F.R. § 4332, *et seq.,* NEPA created the Council on Environmental Quality [CEQ], 42 U.S.C. § 4332(2)(C). The CEQ has promulgated regulations, 40 C.F.R. pt. 1500, which are intended to particularize the procedures necessary for NEPA compliance. *See Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir. 1985). The CEQ regulations are "binding on all

Federal agencies." 40 C.F.R. § 1500.3; Ex. Order 11,991, 3 C.F.R. 123.124 (1978). *See generally* Note, *A New Approach to Review of NEPA Findings of No Significant Impact,* 85 Mich.L. Rev. 191, 195–196, & n. 40 (1986) (citing cases). The CEQ regulations "provide a broad framework for NEPA compliance," *Fritiofson,* 772 F.2d at 1236, but also direct that agencies "review their policies, procedures and regulations," 40 C.F.R. § 1500.6, and develop "supplementary implementing procedures," 45 Fed.Reg. 71968 (FHwA NEPA regulations).

The FHwA has developed specific regulatory procedures to "fully integrate the agency's programs with the CEQ regulation[s] ...," *id. See* 23 C.F.R. pt. 771. Because the FHwA approved the Sears Island FEIS on October 9, 1987, the applicable FHwA regulations are those promulgated on October 30, 1980, as amended May 20, 1982. *See* 23 C.F.R. § 771.109(a)(3) (1988) (stating that the regulations promulgated on August 28, 1987 apply only to "[e]nvironmental documents accepted or prepared after the effective date of [the] regulation[s]"); 53 Fed.Reg. 32646 (the amendments to 23 C.F.R. pt. 771 "are effective on November 27, 1987.")

**10.** The court accords substantial deference to a CEQ interpretation of NEPA. *See Sierra Club v. Marsh,* 701 F.Supp. at 915, n. 10.

Associates[11] [HBA] and Booz–Allen and Hamilton [Booz–Allen] were listed in the "Literature Cited" portion of the FEIS, *id.* at 12–2, 12–6, 12–10, 12–11, plaintiffs fault the FEIS Table of Preparers for listing only Normandeau Associates and Economic Research Associates [ERA] as FEIS "preparers," *see* FEIS, Vol. I, at 9–2. Plaintiffs further argue that Normandeau Associates, HBA and Olko Engineering should have been excluded from the EIS process altogether, because each had an interest in the Sears Island project decision. Alternatively, plaintiffs argue that, at a minimum, HBA, Olko Engineering and Booz–Allen should have been listed in the table of preparers.

### a. *Table of Preparers*

█ The regulation governing inclusion in the EIS table of preparers states that the EIS shall list the names and qualifications of the "persons who were primarily responsible for preparing the [EIS] or *significant background papers.*" 40 C.F.R. § 1502.17 (emphasis added). Defendants justify exclusion of HBA, Olko Engineering and Booz–Allen from the table of preparers on the ground that no employee of any of these firms was involved in drafting or editing the EIS. Defendants have not addressed the significance of the studies prepared by HBA, Olko Engineering and Booz–Allen; the court does so now.

### i. Booz–Allen

The record demonstrates that Booz–Allen prepared five reports, including a study of the effects of the "no action alternative" on cargo volumes at Searsport and other Maine ports, FEIS, Vol. I, at X, 12–2, and a study on projected cargo handling costs at the Mack Point alternative site, *id.* At least one of these reports, which projects future shipping volumes at a new Maine dry cargo terminal, and its likely benefits, was prepared with the understanding that it would be incorporated directly into the EIS. *See* State of Maine, Contract For

Special Services, at 5 (Jan. 2, 1987), Plaintiffs' Supplemental Appendix, at 78–82. The Corps relied in part on Booz–Allen's reports in finding that the Mack Point alternative was impracticable. *See* Corps Record of Decision [Corps ROD], at 19–22 (Corps Record, Vol. III, at 58) (summarizing Booz–Allen's findings that the Mack Point alternative was impracticable, but also accepting "the professional judgment of the State, FHwA and their consultants"). The FHwA relied on Booz–Allen's assessment that Mack Point would be incapable of accommodating a dry cargo facility large enough to handle projected cargo volumes. *See* FHwA Record, Vol. III, at 40 (FHwA ROD). The federal agencies' reliance on these Booz–Allen reports is a sufficient basis upon which to conclude that those reports are "significant background papers" and that Booz–Allen should have been listed in section 9 of the EIS. *See* 40 C.F.R. § 1502.17.

### ii. HBA (Olko Engineering)

HBA prepared at least four reports containing designs, plans and estimates relating to cargo terminal development at Mack Point, Long Cove, and Sears Island. *See* FEIS, Vol. I, at 12–6; Plaintiffs' Supplemental Appendix, at 52–55, 61–65, 77. Olko Engineering was the subcontractor charged with preparing the marine structure designs for at least two of these HBA reports. *See* Plaintiffs' Supplemental Appendix, at 52–55, 61–66. MDOT also engaged HBA to coordinate the review team assembled to respond to comments on the DEIS. *See* Plaintiffs' Appendix, at 167–191. In that role HBA summarized the key points of contention surrounding the DEIS, *id.* at 175, established a work flow diagram, *id.* at 168, and moderated meetings "to keep the discussion properly directed," *id.* MDOT also referred to HBA and Olko Engineering two of the twenty questions raised by the Corps at the December 4, 1987 meeting on the FEIS, and MDOT directly incorporated their responses as its

---

**11.** HBA and TYLIN International merged in 1985. In this opinion, "HBA" encompasses both

own.[12] *See* Corps Record, Vol. II, at 27.

■ The court can find no guidance, either in the regulations, case-law, or explanatory materials published by the CEQ, as to the meaning of the term "preparer." The regulation governing the table of preparers does not define the term "preparer," but merely states that "[n]ormally the list will not exceed two pages." 40 C.F.R. § 1502.17. Absent guidance, and unless inconsistent with the regulation itself, the term "preparer," as used in reference to a written document such as an EIS, should be given its usual meaning; that is, a "preparer" is one who puts in written form or draws up a document, *see* Webster's Third New International Dictionary (Unabridged), at p. 1790 (1976). Clearly, not every *participant* in the EIS process need be listed as a preparer. An important distinction between the *preparer* of a document, and someone who participates in gathering information used in preparing it, is the *discretion* possessed by the *preparer*, to accept, reject or modify the information submitted for consideration by subordinate participants in the EIS process. Mere coordination of a DEIS response team, for instance (or mere responsibility for drafting proposed responses to EIS comments), absent evidence that the coordinating consultant (or scrivener) has been given decisionmaking authority by the lead agency to determine EIS content, as distinguished from the responsibility to inform and make recommendations to the agency, would not make the consultant a "preparer."

The record does not indicate that either HBA or Olko Engineering was "primarily responsible for preparing the environmental impact statement...." 40 C.F.R. § 1502.17. Nevertheless, since there is evidence that HBA and/or Olko Engineering were primarily responsible for preparing *significant background papers*, those firms should have been included in the table of preparers. *See* 40 C.F.R. § 1502.17.[13]

### b. *Selection of EIS Preparers*

■ The regulation governing EIS preparation requires that "any environmental impact statement prepared pursuant to the requirements of NEPA shall be *prepared* directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency." 40 C.F.R. § 1506.5(c) (emphasis added). Plaintiffs argue that the FHwA violated NEPA regulations by not *directly* selecting the

---

firms.

**12.** The following questions were referred to HBA and Olko Engineering:

(10) To what extent is there enough room on Mack Point to accommodate 2–4–6 berths? What are the operational limitations and can these be quantified? How do they compare to Sears Island, and what do any differences mean? EPA says differences are marginal in terms of other critical factors which likely will not be met.

. . . .

(13) Are there any accepted standards, guidelines or recommendations for pier and storage areas for certain commodities for modern terminals? i.e. How much land is recommended for 2 berth, 6 berth? What's exactly available at Mack Point? And where is it? Does EIS map of Mack Point 6–berth configuration really reflect enough land? Could wetland impacts on Mack Point be further avoided, as the Agencies believe, and still allow enough room for the backland storage? And would any additional movements mean more inefficiencies? How does that impact the practicability of the entire project?

Corps Record, Vol. II, at 27.

**13.** The record does not contain a detailed summary of the contents of the reports prepared by HBA and Olko. However, given the importance of EIS consideration of Mack Point as an alternative site for the proposed dry cargo terminal, it is at least possible that the HBA/Olko Engineering report, containing a *comparative analysis* of terminal designs for Mack Point and Sears Island, constitutes a "significant background paper." *See* FEIS, Vol. I, at 12–6.

The governing regulation states:

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were *primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement* (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

40 C.F.R. § 1502.17 (emphasis added).

outside consultants which prepared the EIS.

The record reveals, however, that even though Booz–Allen, HBA and Olko Engineering may have submitted significant background papers, thus warranting their inclusion in the table of preparers, *see* section II.A.1.a. *supra*, none of these consultants had sufficient discretionary authority to be considered preparers of the *EIS, id.* Because the regulation requires only that the *EIS* be *prepared* by consultants selected by the lead agency, it was not a violation of NEPA for MDOT to contract directly (without the approval of FHwA) with HBA, Olko Engineering and Booz–Allen to prepare significant background reports. The record clearly demonstrates direct involvement by the FHwA in the initial decision to contract with Normandeau Associates for preparation of the EIS, *see* FHwA Record, Vol. I, at 2 (decision to hire Normandeau Associates made at initial meeting attended by MDOT, FHwA, Corps and Coast Guard), and that the FHwA approved ERA as a subcontractor, Plaintiffs' Supplemental Appendix, at 71–75.

Therefore, the claim that the FHwA violated NEPA by failing to approve the outside consultants selected to prepare the EIS must fail. *See* Plaintiffs' Supplemental Appendix, at 71–75 (contract between MDOT and Normandeau Associates, signed by approving FHwA official).

### c. *Conflicts of Interest*

The plaintiffs argue that the FHwA violated NEPA regulations by not obtaining the required conflict of interest disclosure statements from consultants selected to prepare the EIS. Plaintiffs further maintain that Olko Engineering, HBA and Normandeau Associates should have been disqualified from participation in the EIS process, due to alleged bias developed while these consultants performed services relating to the Sears Island project prior to the decision in *Sierra Club I*, which vacated the original federal permits for the project and directed the preparation of an EIS.

The defendants respond, first, that the applicable regulation, 40 C.F.R. § 1506.5(c), applies only to consultants which "prepared" the EIS, not to those which merely provided background material for an EIS that MDOT had an active role in preparing. Therefore, defendants urge, HBA and Olko Engineering were not required to file conflict of interest disclosure statements. FHwA Internal Memorandum (Affidavit of William Richardson [Richardson Aff.], Attachment A). Next, defendants maintain that the FHwA reasonably interprets this regulation to require a conflict of interest disclosure statement only in those "highly unique cases in which a contractor *independently* prepares an EIS for the State which then *adopts* the EIS as its own." Richardson Aff., Attachment A (emphasis in original). Finally, defendants argue that neither Normandeau Associates nor ERA, the only consultants engaged to *prepare* the *EIS*, actually had any interest in the proposed project, financial or otherwise, which required their disqualification as EIS preparers.

### i. Conflict of Interest Disclosure Statements

The regulation governing conflicts of interest in the EIS process states, in pertinent part:

> Any [EIS] prepared pursuant to ... NEPA shall be prepared ... by a contractor ... chosen ... to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, ... specifying that they have no financial or other interest in the outcome of the project.

40 C.F.R. § 1506.5(c).

■ Considering the plain language of section 1506.5(c), and the CEQ's interpretation of it, *see CEQ Forty Questions,* 46 Fed.Reg. at 18031 ("a consulting firm preparing an EIS must execute a disclosure statement...."), the FHwA reasonably interprets section 1506.5(c) as requiring that a conflict of interest disclosure statement be filed only by a contractor engaged to *prepare* the *EIS,* not by a contractor engaged to prepare significant *background papers.* Therefore, the failure to require HBA, Olko Engineering and/or Booz–Allen to file conflict of interest disclosure statements was not a violation of NEPA.

On the other hand, defendants' argument that Normandeau Associates and ERA were excused from supplying conflict of interest disclosure statements notwithstanding their contractual agreements to prepare the EIS does not flow ineluctably from the FHwA Memorandum interpreting section 1506.5(c). The FHwA Memorandum states in pertinent part:

> The FHWA recognizes that in the preparation of an EIS a State works closely with consultants who might later have an interest in performing all or part of the final design on a selected alternative. We do not believe subsection 1506.5(c) was promulgated with the intent to upset the traditional Federal/State relationship. Rather, we interpret this section to apply only to those highly unique cases in which a contractor *independently* prepares an EIS for the State which then *adopts* the EIS as its own.
>
> When a contractor (and/or subcontractor), in the role of a consultant, prepares studies which the State incorporates into an EIS which the State has taken an active role in preparing, it is not necessary for that contractor to execute the disclosure statement required by subsection 1506.5(c). Our experience confirms that State agencies act in good faith in choosing consultants for environmental studies and that the analysis contained in the EIS is the agency's own, culled from a variety of studies, public input, and other assistance which it has received during the preparation of the EIS.

Richardson Aff., Attachment A (emphasis in original).

Normandeau Associates and ERA prepared studies which MDOT incorporated into the EIS, but Normandeau Associates also authored the EIS sections on marine impacts, water quality, air quality, noise, marine geology and sediments, and ERA authored sections concerning socioeconomic impacts, including the "purpose and need" section. See FEIS, Vol. I, at 9–2 to 9–5. It appears that the only sections of the EIS which were written by MDOT were those dealing with aesthetics and visual resources. See id. at 9–5. The record indicates also that Normandeau Associates, the consultant with which MDOT contracted for the preparation of the EIS, see Plaintiffs' Supplemental Appendix, at 71–75, and ERA, Normandeau's subcontractor, see id., had consulted, and exchanged views, with MDOT and various federal agencies concerning the EIS. See, e.g., FHwA Record, Vol. II, at 12 (notes of meeting attended by MDOT, FHwA, Normandeau Associates, ERA, Corps, FWS and various state agencies); id. at 11 (memorandum from Frank Mahady of ERA to Bill Barry of Normandeau Associates discussing consent decisions).

The conflict of interest regulation is intended to preserve the "objectivity and integrity of the NEPA process." *CEQ Forty Questions,* 46 Fed.Reg., at 18031. The CEQ states that "a consulting firm *preparing* an EIS must execute a disclosure statement." *Id.* (emphasis added). MDOT, with FHwA approval, contracted with Normandeau Associates to "prepare an Environmental Impact Statement (EIS) for the Department's Sears Island Marine Dry Cargo Terminal and Access Road Projects." Plaintiffs' Supplemental Appendix, at 72, 74. Normandeau Associates and ERA authored many important sections of the EIS and made recommendations concerning other EIS content. Given that the purpose of the regulation is to ensure the integrity of the NEPA process, it is clear that conflict of interest disclosure statements should have been obtained from Normandeau Associates and ERA.[14]

---

14. Literal application of FHwA's interpretation of section 1506.5(c) could swallow the CEQ regulatory requirement of conflict of interest statements from firms which contract to prepare an EIS. The FHwA interpretation is predicated on its "experience[, which] confirms that State agencies act in good faith in choosing consultants for environmental studies and that the analysis contained in the EIS is the agency's own...." Richardson Aff., Attachment A. But this interpretation of the CEQ requirement of a conflict of interest statement egregiously *substitutes* FHwA's experience-based general estimate of state agency "good-faith" course-of-dealing with consultant—EIS preparers in place of the *disclosure* vehicle (i.e., the conflict of interest statement) which is essential to enable federal agency decisionmakers, the public, and other

## ii. Contractor Disqualification

Although the FHwA erred in not obtaining conflict of interest statements from Normandeau Associates and/or ERA, that is not to say that plaintiffs have demonstrated that any consultant, whether engaged to prepare the EIS or significant background papers, should have been disqualified from participation in the EIS process.[15] The regulations governing conflicts of interest state that consultants hired as EIS *preparers* should be chosen to "avoid any conflict of interest." 40 C.F.R. § 1506.5(c). The CEQ defines "conflict of interest"

> Broadly to cover any known benefits [financial or otherwise] other than general enhancement of professional reputation. This includes any financial benefit such as a promise of future construction or design work on the project, as well as indirect benefits the consultant is aware of (e.g., if the project would aid proposals sponsored by the firm's other clients). For example, completion of a highway project may encourage construction of a shopping center or industrial park from which the consultant stands to benefit.

46 Fed.Reg. at 18031. "If a consulting firm has a conflict of interest it should be *disqualified* from *preparing* the EIS, to preserve the objectivity and integrity of the NEPA process." *Id.* (emphasis added). Plaintiffs argue that project involvement on the part of HBA and Olko Engineering disqualified those firms from any *participation in the Sears Island EIS process.*[16]

■ The applicable regulation and its CEQ interpretation are concerned with consultants engaged to *prepare* an *EIS. See* 40 C.F.R. § 1506.5(c) ("[An EIS] ... shall be prepared ... by a contractor ... chosen ... to avoid any conflict of interest."); *CEQ Forty Questions,* 46 Fed.Reg. at 18031 (discussing when consultants should be disqualified from "preparing the EIS ...") (emphasis added). The regulation states specifically that "[n]othing in this [regulation] is intended to prohibit any agency from requesting any person to submit information to it or prohibit any person from submitting information to any agency." 40 C.F.R. § 1506.5(c). Therefore, although it appears that HBA and Olko Engineering were disqualified from *preparing* the *EIS,* these consultants were not disqualified from submitting information for use by the EIS preparers.

■ The plaintiffs assert two grounds in support of their contention that Norman-

---

interested persons, to evaluate whether the integrity of a particular EIS process may have been compromised by consultant bias.

**15.** Plaintiffs have never alleged that ERA had an interest in the decision to construct the proposed dry cargo terminal.

**16.** On June 11, 1982, MDOT contracted with HBA to develop "preliminary designs, plans, estimates and environmental assessments for the construction of a marine dry cargo terminal located on Sears Island...." Plaintiffs' Supplemental Appendix, at 52. As provided in its contract with MDOT, *id.* at 53, HBA entered into two subcontracts; one with Normandeau Associates for the preparation of an environmental assessment of the project, and one with Olko Engineering for marine structure design. *See id.* at 53, 57. On October 12, 1983, MDOT entered into a contract with HBA for the development of final designs, plans, specifications and estimates for the Sears Island project. *Id.* at 61. Normandeau Associates was not involved in the second contract, but Olko Engineering remained responsible for marine design. *Id.* at 62. This contract was later amended to include preparation of preliminary designs and cost estimates for marine facilities on Mack Point and/or Long Cove. *See id.* at 77 (amendment dated October 17, 1986).

HBA and Olko Engineering were retained in 1985 to provide "construction administration, construction monitoring and ancillary technical support services" for the project, *id.* at 66, 76, in return for an estimated total contract payment of $1,645,000. Although Articles III through V of the 1985 contract are not included in the present record, the contract speaks prospectively and there is nothing in the record to indicate that HBA and Olko Engineering are not under contract to provide these services.

Although it is not entirely clear that the 1985 construction contract is still in force, HBA currently is serving as the "project engineer for the Sears Island Marine Dry Cargo Terminal." Affidavit of Ralph P. Norris, at ¶ 3 ("I am the project manager for [HBA] in charge of the firm's work for the project and in that capacity I am responsible for construction contract review and administration.") For present purposes, the court finds that these firms remain under contract to administer construction of the Sears Island cargo terminal and that they have had a significant interest in the outcome of the project predating the preparation of the EIS.

deau Associates should have been disqualified as an EIS preparer. First, Normandeau Associates was involved with the proposed Sears Island project prior to the *Sierra Club I* decision mandating that an EIS be prepared.[17] Second, while preparing the EIS,[18] Normandeau Associates assisted MDOT with its application for the Corps permit. Nevertheless, plaintiffs have failed to demonstrate, whether by virtue of prior involvement with the Sears Island project or by assisting with the preparation of the Corps permit application, that Normandeau Associates had any interest in the outcome of the project.

In the circumstance where a consultant selected to prepare an EIS has been "involved in developing initial data and plans for the project, but does not have any financial or other interest in the outcome of the decision . . . ," *CEQ Forty Questions*, 46 Fed.Reg. 18031, the consultant need not be disqualified from participation in the project. The CEQ counsels that the DEIS "should clearly state the scope and extent of the firm's prior involvement to expose any potential conflicts of interest that may exist." *Id.* But absent an actual conflict of interest the statute and regulations are satisfied by a conflict of interest disclosure statement. The *CEQ Forty Questions* do not impose requirements beyond the NEPA regulations. *See CEQ Forty Questions*, 46 Fed.Reg. 18026 ("These answers, of course, do not impose any additional requirements beyond those of the NEPA regulations."). Therefore, failure to disclose, in the DEIS, Normandeau Associates' prior involvement with the Sears Island project

did not constitute a separate NEPA violation upon which plaintiffs are likely to prevail.

### 2. Independent Evaluation

Plaintiffs claim that neither the FHwA nor the Corps independently evaluated the FEIS prepared by MDOT and its consultants. The FHwA served as the lead federal agency for EIS preparation, with responsibility for its scope and content. *See* 40 C.F.R. § 1506.5. As a cooperating agency, prior to adopting the FHwA FEIS the Corps bore responsibility for independent review of the FEIS and for ensuring that all Corps comments and suggestions were accommodated. *See* 40 C.F.R. § 1506.3(c).

#### a. *FHwA Evaluation*

■ NEPA allows a lead agency to delegate responsibility for EIS preparation to a state agency only if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation, [and]

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption.

42 U.S.C. § 4332(2)(c). The requirement of independent evaluation is "intended to assure that the Federal agency consider, critically review and where appropriate, change and supplement" an EIS prepared by a state agency. H.R.Rep. No. 144, 94th

---

**17.** Normandeau Associates was engaged as a subcontractor to prepare the environmental assessment section of HBA's 1983 Preliminary Design Report. Plaintiffs' Supplemental Appendix, at 52–56. Although HBA and Olko Engineering were awarded a $1.6 million contract in 1985 to provide construction administration and supervision assistance, *id.* at 66–70, Normandeau Associates' next connection with the project was its contract to prepare the EIS, *id.* at 71–75.

**18.** The plaintiffs argue that Normandeau Associates' assistance to MDOT in the preparation of the Corps permit application, while Normandeau Associates was preparing the DEIS, made Normandeau Associates an advocate for the

project. The Corps permit application is a two-page form which requires the applicant to identify itself, give the location of the proposed project, give a brief summary of its purpose, identify the status of other permits needed for construction, and describe the work for which a Corps permit is required. Responding to these questions and gathering the attachments (i.e., maps of the project and the clam mitigation sites, and copies of the notice of DEIS availability) were ministerial tasks delegated to the consultant by MDOT. The court cannot agree that this ministerial involvement on the part of Normandeau Associates demonstrates a basis for disqualification from the EIS process.

Cong., 1st Sess. 5 (1975) U.S.Code Cong. & Admin.News 1975, pp. 859, 862.[19] Plaintiffs argue that the FHwA failed to undertake its own thorough evaluation prior to approval of the FEIS. Plaintiffs specifically charge that the FHwA failed to make an independent *verification* of information submitted by MDOT and its consultants.

The NEPA regulation governing lead agency responsibility for EIS review states:

> (a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy.... It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.
>
> . . . .
>
> (c) ... *If the document is prepared by contract,* the responsible Federal official shall furnish guidance and participate in the preparation and shall *independently evaluate the statement* prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

40 C.F.R. § 1506.5(a), (c) (emphasis added).

As plaintiffs recognize, the FHwA delegated responsibility for EIS preparation to MDOT, which contracted with Normandeau Associates for EIS preparation with the *approval of the FHwA.* The NEPA regulation requires independent agency *verification* of all information supplied by an *applicant* if the agency relies on the information in preparing an EIS. Where, as was the case here, the EIS is prepared by an outside *consultant,* the federal agency must furnish guidance, participate in its preparation and *"independently evaluate the* [EIS] *statement."* 40 C.F.R. § 1506.5(c); *see* 23 C.F.R. § 771.109(c)(1). In its supplemental memorandum denying plaintiffs' motion for a preliminary injunction, this court found that FHwA personnel did *participate* in the preparation of the EIS. *Sierra Club,* 701 F.Supp. at 918 (emphasis added).[20]

The court now considers whether the FHwA independently *evaluated* the EIS prepared by MDOT and Normandeau Associates. The record demonstrates that the FHwA did more than provide mere formal review of the EIS. *See Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1025 (4th Cir.) (suggesting that a review limited to the form of an EIS is inadequate under NEPA), *cert. denied,* 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140

**19.** Subsection 4332(2)(C) was added in response to the Second Circuit decision in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 508 F.2d 927 (2d Cir.1974), *vacated sub nom. Coleman v. Conservation Society of Southern Vermont, Inc.,* 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), which required that the entire EIS be prepared by the lead federal agency. *See* S.Rep. No. 52, 94th Cong., 1st Sess. 2, *reprinted in* U.S.Code Cong. & Admin.News 859, 860.

**20.** The record indicates that FHWA personnel participated in the preparation of the EIS. Defendant Richardson met with representatives of MDOT, the Coast Guard, and the Corps to "discuss EIS preparation and permitting procedures." MDOT Appendix, at 15. The FHWA approved the use of ERA and Normandeau Associates, the only consultants regarded as "preparers." FHWA representatives participated in the "scoping" procedure. Federal Defendants' Appendix, at 3–21. FHWA representatives met with MDOT and Corps personnel to discuss the draft outline. Federal Defendant's Appendix, at 25. FHWA representatives met also with MDOT personnel throughout the process, to monitor the progress of the EIS and to provide input. *Id.* at 30–33, 35–39, 55–57. Defendant Richardson (FHWA Division Administrator) toured Mack Point with MDOT and federal officials as part of their consideration of Mack Point as an alternative site. MDOT Appendix, at 89–92. FHWA "specialists" reviewed both the DEIS and the FEIS to insure compliance with the applicable laws. *See, e.g.,* Federal Defendants' Appendix, at 33, 57. Defendant Richardson circulated the FEIS, with detailed responses to comments received on the DEIS.

(1975). William Richardson, Division Administrator of FHwA, "studied" the reports and analyses of MDOT and its consultants. Richardson Aff., at ¶¶ 12.[21] Steve Ronning, a FHwA environmental policy specialist in Washington, D.C., and Bruce Mattson, a FHwA regional environmental engineer, also considered background reports. *Id.; see also id.* at ¶ 22 (Richardson, Ronning and Mattson discussed the report upon which the EIS section on secondary impacts was based). Richardson reviewed comments on the "scoping" document, *id.* at ¶ 17; *accord* FHwA Record, Vol. I, at 30, 33, 35, and on the DEIS, Richardson Aff. at ¶ 17; *accord* FHwA Record, Vol. I, at 25. Based on these comments, Richardson raised questions concerning the project's impact on seals, and as a result further studies were conducted. *Id.* at ¶ 18; FHwA Record, Vol. II, at 3, 15. Both the FHwA regional and national offices read the DEIS, and the national office prepared several substantive comments. *See* FHwA Record, Vol. II, at 46 (containing eight comments, including: "The [wetlands] discussion needs to demonstrate that there are no practicable alternatives to avoid the wetlands and that all practicable measures to minimize harm will be accomplished."); *id.* at 41 ("minor" comments prepared by regional office, mainly pointing up procedural errors and recommend-

ing style changes, *e.g.* "Figures 3.2–2 and 3.2–9 need north arrows."). FHwA personnel met with interested agencies and toured Kidder Point, FHwA Record, Vol. I, at 29, and Mack Point, *id.*, Vol. II, at 47, 48, 49. FHwA personnel attended a meeting on the practicability of the Mack Point site during which "a lengthy philosophical discussion ensued as to the findings of the TBS report." FHwA Record, Vol. III, at 15 (May 14, 1987, File Memorandum prepared by Richardson). *See id.* at 17 (June 1, 1987, Memorandum prepared by David Ober of MDOT detailing same meeting). Finally, following issuance of the FHwA ROD Richardson reviewed responses to twenty Corps questions about the FEIS, Richardson Aff., at ¶ 42; *accord* FHwA Record, Vol. III, at 36, and considered TBS materials generated for the Corps review process. Richardson concluded "that [the TBS motion was] a restatement of previously presented data and arguments ... [not] even remotely sufficient to trigger the need for a supplemental EIS." Richardson Aff., at ¶ 44.

Whether an agency has "independently evaluated an EIS is a question of fact, to be determined on a case-by-case basis." *Citizens for Balanced Environment & Transportation, Inc. v. Secretary of Transportation,* 515 F.Supp. 151, 158 (D.Conn.), *aff'd,* 650 F.2d 455 (2d Cir.1981).

---

*Sierra Club,* 701 F.Supp. at 918.

**21.** Documents "personally reviewed" by Richardson included:

(a) Proposed Scope of Inquiry for Sears Island EIS (Economic Research Associates, October 30, 1985) (FHWA Record at Vol. I–21);

(b) A Survey of Lobstermen Fishing in the Vicinity of Sears Island, Maine (Normandeau Associates, Inc. January 31, 1986) (FHWA Record at Vol. II–6);

(c) Preliminary Design Studies, Marine Dry Cargo Terminal and Comparative Analysis, Sears Island/Mack Point, Searsport, Maine, Design and Operation Comparisions (sic) (Hunter–Ballew) Associates, Olko Engineering, June 12, 1986) (FHWA Record at Vol. II–28);

(d) Terrestrial Ecology of Sears Island for Sears Island Coal Unit No. 1 (ERT for Central Maine Power, 1977) (FHWA Record at Vol. II–30);

(e) Minutes of Conference with Bangor & Aroostook Railroad Officails (sic) (TYLIN In-

ternational/Hunter–Ballew Associates, December 11, 1986) (FHWA Record at Vol. II–56);

(f) Minutes of Conference with Irving Oil Company (TYLIN International/Hunter–Ballew Associates, January 15, 1987) (FHWA Record at Vol. III–5);

(g) Minutes of Conference with Sprague Energy Corporation (TYLIN International/Hunter–Ballew Associates, January 30, 1987) (FHWA Record at Vol. III–9);

(h) A Review of Current and Future Dry Cargo Handling Capabilities at Mack Point, Searsport, Maine (Temple, Barker & Sloane, April, 1987) (FHWA Record at Vol. III–10);

(i) Proposed Marine Terminal at Searsport, Maine (Temple, Barker & Sloane, September, 1987) (FHWA Record at Vol. III–22); and

(j) Comments on Sears Island Dry Cargo Terminal and Access Road, Searsport, Waldo County, Maine, Final Environmental Impact Statement of October 19, 1987 (Temple, Barker & Sloane, November 2, 1987) (FHWA Record at Vol. III–27).

The record in the present case demonstrates that the FHwA did much more than reflexively rubber-stamp the EIS prepared by MDOT and Normandeau Associates. The EIS evaluation by the FHwA met or exceeded the levels of independent evaluation found sufficient in other cases. *See, e.g., Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956 (1st Cir.1976) (agency approved award of contract, reviewed preliminary DEIS, held meetings with applicant preparer); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation,* 531 F.2d 637 (2d Cir.1976) (agency maintained frequent contact with state officials, took field trips, circulated EIS to interdisciplinary task force); *Lange v. Brinegar,* 625 F.2d 812 (9th Cir.1980) (agency contributed to DEIS through weekly meetings and phone calls, made field trips, reviewed EIS at regional and national levels); *Fayetteville Area Chamber of Commerce,* 515 F.2d at 1025 (federal agency was involved with DEIS, undertook field inspections, made recommendations as to content, and attended meeting with state).

Plaintiffs have not demonstrated a likelihood of success on the merits of their NEPA claim that the FHwA failed to make an independent evaluation of the FEIS.

### b. *Corps Review*

■ The plaintiffs charge that the Corps failed to conduct an independent review and evaluation of the FHwA FEIS and the information submitted by MDOT.

The NEPA regulation governing cooperating agency involvement in the NEPA process states:

A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an *independent review* of the

Richardson Aff., at ¶ 46.

**22.** For purposes of the present discussion, the court assumes that the FHwA FEIS meets the standards for an adequate EIS. No matter how adequate the evaluation by a cooperating agency, its adoption of an inadequate FEIS is ineffectual. *Accord* 40 C.F.R. § 1506.3(a) ("An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof

statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

40 C.F.R. § 1506.3(c) (emphasis added).[22]

Corps personnel were involved in the EIS process from its inception. *See* FHwA Record, Vol. I, at 2 (notes of meeting to discuss EIS preparation, attended by Corps, FHwA, Coast Guard, MDOT). The Corps attended the "scoping" meeting and provided comments. *See* Corps Record, Vol. IV, at 7, 11. Several Corps representatives reviewed the DEIS with a view to its "form and substance," and the Corps reviewed and analyzed comments received during the DEIS comment process and at the public hearing. *See* Affidavit of William Lawless, at ¶ 23 (Lawless Aff.) (listing six other Corps reviewers, including members of the impacts analysis branch). The Corps provided MDOT with 11 general and 43 specific comments on the DEIS. *See* FEIS, Vol. II, at F–4 (including the following comments: DEIS does not demonstrate that construction of a dry cargo terminal is economically feasible; visual impacts should be quantified; and reasonable alternatives should be defined and fully considered). The Corps Impacts Analysis Branch reviewed the FEIS. Lawless Aff., at ¶ 26; Corps Record, Vol. V, at 22–24.

In addition to reviewing EIS documents, the Corps attended several meetings held to consider EIS information and conclusions,[23] reviewed significant background papers upon which the EIS relies, *see* Lawless Aff. at ¶ 28, and considered TBS critiques of certain FEIS assumptions, *id.; see* Corps Record, Vol. II, at 13. Additionally, the Corps asked MDOT for further clarification of the FEIS in the form of the twenty questions generated by Corps

meets the standards for an adequate statement under these regulations.") *See* note 62 *infra.*

**23.** *See, e.g.,* FHwA Record, Vol. II, at 21 (discussion of preliminary DEIS); Corps Record, Vol. V, at 15 (meeting to discuss mitigation measures, attended by MDOT, Normandeau Associates, NMFS, Corps and Maine Department of Mineral Resources); FHwA Record, Vol. III, at 18 (meeting attended by Corps, MDOT, Normandeau Associates and FHwA).

analysis of the FEIS and comments. *See* Corps Record, Vol. III, at 82. The Corps ROD was issued only after Corps review of the MDOT responses to the twenty questions, which Lawless considered to be an "expan[sion] upon previously submitted information ... [but] which did not raise any new issues or present new information" requiring a supplemental EIS. Lawless Aff., at ¶ 33.

Plaintiffs have not shown that the Corps failed to provide *independent review* of the FEIS.

### 3. Secondary Impacts

The plaintiffs claim that the FEIS analysis of secondary impacts is inadequate because it is predicated on the erroneous assumption that only "light-dry" industries are reasonably foreseeable tenants of the industrial park and its environs. Plaintiffs argue that "heavy" industrial development is reasonably foreseeable and that the EIS is fundamentally flawed because it *assumes* that only those industries which would have no significant effects on air or water quality are reasonably foreseeable industrial tenants.[24]

NEPA regulations require that the EIS discuss the direct and indirect (or secondary) effects of the proposed project. *See* 40 C.F.R. § 1502.16. Section 1508.8 defines the "indirect effects" to be discussed in the EIS:

"Effects" include:

. . . .

(b) Indirect effects, which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems.

Effects and impacts as used in these regulations are synonymous. Effects includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative. Effects may also include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

40 C.F.R. § 1508.8.

In *Sierra Club I* the First Circuit rejected the conclusion arrived at in the Corps EA ("because the secondary development being considered is 'light dry industrial,' 'there should be no significant air or water quality impacts from this type of industrial operation....'") as unsupported and unexplicated. 769 F.2d at 881 (quoting Corps EA). The First Circuit discussed two studies that were available at the time the Corps EA was prepared: a "35–page 'Land Use Plan/Industrial Marketing Study' prepared for the owner of [the remainder of Sears Island] and the town's 50–page 'Municipal Response Plan for the Industrial Development of Sears Island'" [Mallar Report], which provided "detailed descriptions of likely further development [on Sears Island]." *Id.* at 879. Although it acknowledged that actual future development might not follow the "precise course" suggested in the documents, the First Circuit found these documents "detailed enough for an EIS to describe the *type* of development likely to occur, even if it [was] pointless to analyze precise details." *Id.* (emphasis in original). The court of appeals concluded that an EIS was necessary because the Corps' unsupported conclusions concerning secondary development demonstrated a "failure to consider adequately the fact that building a port and causeway may lead to further industrial development of Sears Island, and that further development will significantly affect the environment."[25] *Id.* at 877.

---

**24.** Plaintiffs continue to challenge only the *types* of industries evaluated in the FEIS. They do not contend that the FEIS inadequately evaluates the particular industries discussed in the FEIS. *See Sierra Club,* 701 F.Supp. at 919 n. 15.

**25.** Plaintiffs insist that it was unreasonable for defendants to predicate their FEIS secondary

The FEIS secondary impact analysis devotes

47 pages to a discussion of the proposed industrial park as a secondary project impact. FEIS, Vol. I, at 4–108 to 4–154. The secondary impact analysis is based on assumptions about the scale of the development, the phasing of the development, the commuting distance of the industrial employees, and the types of industry expected to locate in the industrial part (sic). The four industry types assertedly targeted for the proposed industrial park adjacent to the port terminal are: fabricated metal products; non-electrical machinery and equipment; electrical and electronic machinery and equipment; and transportation equipment. FEIS, Vol. I, at 4–109, 4–130. The FEIS environmental analysis is predicated on the assumption that "these industries would not be expected to have large steam demands; combustion of fuels would be primarily for space heating, and that the "industries targeted would ... [not] have major water use and discharge requirements." FEIS, Vol. I, at 4–117, 4–120.

*Sierra Club,* 701 F.Supp. at 918.

The assumptions underlying the FEIS secondary impact analysis are based on large part on information contained in the Mallar Report. *See* FEIS, Vol. I, at 4–108, 4–109, 4–110, 4–117, 4–120 (assumptions concerning scale of development, commuting distance of employees, types of industries and likelihood of significant air and/or water impacts, based on Mallar Report); Richardson Aff. at ¶ 22. The Mallar Report in turn is grounded in the *assumption* that fabricated metal products, non-electrical machinery and equipment, electrical and electronic machinery and transportation equipment would "ultimately become the primary tenants of the [industrial] park." Mallar Report, at 4 (Corps Record, Vol. E4, at 7). The Mallar Report identified these

target industries on the strength of the "Land Use Plan/Industrial Marketing Study" prepared for Bangor Investment Company [BIC], the *owner* of the remainder of Sears Island, in which

[a] wide variety of national growth industries were ranked on the basis of compatibility with a location such as Searsport, potential use of port related transportation, growth rate in employment in the industry, the stability of the industry, wage levels, minimum environmental impacts, and use of the area labor force and of local products and services.

*Id.* at 3. On the basis of the rankings assigned in the BIC marketing study, its authors concluded that machinery and equipment fabricators and assemblers "could best use the opportunities offered by Sears Island, the cargo port, and the surrounding area and in turn offer the most benefit to the Searsport area." *Id.* The Mallar Report considered only the four targeted industries because "[t]hose directly involved with the [industrial] park [chose] those four groups as their primary focus for marketing efforts." *Id.*

The court specifically directed the parties to address "in detail the adequacy of the bases for all of the assumptions underlying the secondary impact analysis of the EIS" and "whether or not the agency decision to evaluate the environmental impact of only the four target industries in the Sears Island industrial park was 'arbitrary or capricious.'" *Sierra Club,* 701 F.Supp. at 918, 919. Instead, the parties focus solely on whether the decision to discuss only the impacts expected from the four targeted industries was arbitrary and capricious.

Defendants correctly point out that NEPA merely requires analysis of secondary impacts which are "reasonably foreseeable" as a result of "the [proposed] action," *see* 40 C.F.R. § 1508.8, and the defendants

___

impact analysis on the Mallar Report, because *Sierra Club I* expressed criticism of the Corps' conclusion that secondary development would be "light-dry industrial." Plaintiffs misread *Sierra Club I.* In *Sierra Club I* the First Circuit noted that the conclusion "that the project would have no significant impact rest[ed] not so

much on their belief that the industrial park would not affect the environment, as upon their belief that they [did not need to] take account of the industrial park's effects." 769 F.2d at 881. In fact the First Circuit noted that the Mallar Report provided useful information for secondary impacts analysis. *Id.* at 879.

insist that it was reasonable to conclude that only the four industries targeted in the Mallar Report merited analysis under the NEPA regulation. *See id.* Defendants argue that the Mallar Report provided a reasonable and logical point of departure between the infinite number of industries that might possibly benefit in some measure from locating near a modern cargo terminal, and those which could be described with sufficient specificity to make their consideration useful.

■ Defendants contend that it was not arbitrary or capricious to exclude from EIS analysis *past* proposals for Sears Island industrial development, i.e., those which preceded the proposal to develop a marine dry cargo terminal on Sears Island [preproject proposals], because those preproject proposals could not be considered as having been *caused* by the cargo port. *See* Supplemental Memorandum of Law and Memorandum in Support of [MDOT's] Motion for Summary Judgment [MDOT Supplemental Memorandum], at 115 ("FHwA considered [preproject proposals] but concluded that it 'simply cannot agree with the argument that somehow those projects could be induced by or attributable to the proposed action,' as their cost would dwarf the cost of the proposed project and such development would proceed independently of the proposed project.") At a February 12, 1986 meeting held to consider the DEIS outline, the "issue of Secondary Impacts was discussed in detail." FHwA, Vol. II, at 13 (FHwA Field Trip Report completed by Bruce Mattson). It was agreed that the secondary impact analysis would be confined to those impacts which were "made possible by the action and not possible without it." [26]

Although the court does not doubt that the availability of a modern marine dry cargo terminal, with rail and highway access, may be a material consideration in the selection of a site for a power plant or an aluminum smelter, the court may not substitute its own judgment for that of the agency. *See Bowman Transportation, Inc. v. Arkansas Best–Freight Systems,* 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 413, 91 S.Ct. 814, 822, 28 L.Ed.2d 136 (1971)). As long as the agency articulates a rational connection between "the facts found and the choice made," the agency decision will be upheld. *Id.* (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). *See also Conservation Law Foundation of New England, Inc. v. Secretary of the Interior,* 864 F.2d 954, 958 (1st Cir.1989) (The court must "... affirm agency's decision if it is supported by a rational basis.")

Although preproject proposals included a nuclear or a coal-fired power plant and an aluminum smelter, *see* FEIS, Vol. I, at 4–109, the FHwA rationally determined that those developments could be excluded from consideration because "their size and enormous controversy" would make them "independent of the subject causeway and port project," *id.* It was not arbitrary and capricious for the FHwA to conclude that the construction and operation of a nuclear or a coal-fired power plant and an aluminum smelter would entail such enormous financial costs, public (political) controversy, and regulatory restrictions, that exclusion of these preproject proposals from consideration as *reasonably foreseeable* secondary impacts of the Sears Island cargo terminal was warranted.

■ The defendants further assert that it was reasonable to assume that only the four targeted industries would locate at the industrial park and that there would be no significant air or water impacts. The defendants argue that the federal agencies were entitled to reject recommendations that the EIS evaluate impacts associated with "heavy" industrial development, because "heavy" industry is a term without precise meaning, providing no basis for

---

**26.** The FEIS formulation of the causation element encompasses those secondary impacts "potentially induced by and attributable to the proposed action." FEIS, Vol. I, at 4–109.

analysis.[27] Although *"heavy"* industry is an imprecise term (as is "light-dry" industry), its vagueness is not sufficient reason to restrict the secondary impact analysis to *"light-dry"* industries. The fundamental question is not what is or is not "heavy" industry, but whether anything other than "light-dry" industry (however that imprecise term may be defined) is a reasonably foreseeable secondary development.

The defendants contend that the recommendation made by the Advisory Committee on Coastal Development and Conservation (i.e., that Searsport become one of three potential Maine port sites for future "cluster development of heavy industry," FEIS, Vol. I, at 2–3,[28] does not make it reasonably foreseeable that heavy industry will locate on Sears Island or that the Sears Island port could be considered the cause[29] of the location of heavy industry in the Searsport area, including Sears Island.

The First Circuit explained in *Sierra Club I* that—

> Whether a particular set of impacts is definite enough to take into account, or too speculative to warrant consideration, reflects several different factors. With what confidence can one say that the impacts are likely to occur? Can one describe them 'now' with sufficient specificity to make their consideration useful? If the decisionmaker does not take them into account 'now,' will the decisionmaker be able to take account of them before the agency is so firmly committed to the project that further environmental knowledge, as a practical matter, will prove irrelevant to the government's decision? *See Massachusetts v. Watt,* 716 F.2d at 952–53.

769 F.2d at 878. The *CEQ Forty Questions* provides some further guidance:

> [I]f there is *total uncertainty* about the identity of future land owners or the nature of future land uses, then of course, the agency is not required to engage in speculation or contemplation about their future plans. But, in the ordinary course of business, people do make judgments based upon reasonably foreseeable occurrences. It will often be possible to consider the likely purchasers and the *development trends in that area or similar areas in recent years;* or the likelihood that the land will be used for an energy project, shopping center, subdivision, farm or factory. The agency has the responsibility to make an informed judgment, and to estimate future impacts on that basis, *especially if*

27. A report entitled "Where Should Heavy Industry Be Located in Central Maine?", *see* FEIS, at 12–8, contains the following attempt at a definition:

> Heavy industry means a development characteristically employing equipment such as, but no (sic) limited to, smoke stacks, tanks, distillation or reaction columns, chemical processing equipment, scrubbing towers, pickling equipment, and waste treatment lagoons; which industry, although conceivably operable without polluting or otherwise causing a significant adverse environmental impact on the coastal are (sic) (by, but not limited to, the likelihood of generation of glare, heat, noise, vibration, radiation, electromagnetic interference and obnoxious odors) has the potential to pollute or otherwise cause a significant adverse environmental impact.

Plaintiffs' Memorandum in Support of Objection to Defendants' Motion for Summary Judgment, at 18.

28. The FEIS states that the Advisory Committee on Coastal Management and Conservation has recommended that heavy industry be located in the Portland–South Portland area, the Searsport–Stockton Springs–Penobscot area or the Machiasport–Calais area. FEIS, Vol. I, at 1–4. The Advisory Committee report was completed in 1977. There is nothing in the record to suggest that "cluster development of industry" has taken place at Searsport or either of the other recommended sites during the intervening 12 years.

29. In the memorandum supporting its motion for summary judgment, MDOT appears to contend that it was reasonable for the defendants to conclude that the location of "heavy" industry in the Searsport area would not be *caused* by the port project. However that may be, and notwithstanding the court's earlier directive to the parties, *see Sierra Club,* 701 F.Supp. at 919, there is nothing either in the present record or in the administrative record to indicate that consideration was ever given to whether any heavy (as distinguished from light-dry) industrial development that might occur in the Searsport area could reasonably be attributable to the Sears Island port project, except as concerns a nuclear or coal-fired power plant or an aluminum smelter. *See* FHwA Record, Vol. II, at 13.

*trends are ascertainable* or potential purchasers have made themselves known. *The agency cannot ignore these uncertain, but probable, effects of its decisions.*

46 Fed.Reg. at 18031 (emphasis added).

A potential secondary impact does not become unforeseeable simply because it was proposed for the Searsport *area* in general, rather than for Sears Island in particular. Any exclusion from secondary impact analysis on this ground would be especially suspect inasmuch as the secondary impact analysis in the FEIS purports to encompass development on Sears Island *and* at Mack Point. *See* FEIS, Vol. I, at 4–108. Several studies generated by interests associated with project development were available to the federal defendants. These studies discussed types of industries which could locate in the Searsport area, including Sears Island. *See* Mallar Report, FEIS, Vol. I, at 4–108; BIC report, FEIS, Vol. I, at 4–158; FHwA Record, Vol. II, at 13; Report of Advisory Committee on Coastal Development and Conservation [Coastal Advisory Committee Report], FEIS, Vol. I, at A–2, 2–3, and MDOT EA of August 1983 (stating that *"several forest product and food industries are also expected to have facilities on [Sears] [I]sland,* as well as suppliers of *paper-making machinery and machinery components"*), *Sierra Club I,* 769 F.2d at 878 (emphasis added). The record contains correspondence from the Maine Development Office, dated September 2, 1986, to the effect that surveys have been conducted in connection with land use plans and secondary impacts, noting that the "park is intended for heavy industry." FEIS, Vol. II, at S–2.

The agency decision to restrict the secondary impact analysis to the four industries targeted in the Mallar Report is reviewed under the "arbitrary and capricious" standard. *Concerned Citizens on I–90 v. Secretary of Transportation,* 641 F.2d 1, 5 (1st Cir.1981) (citing *Silva v. Lynn,* 482 F.2d at 1284). *Accord Marsh v. Oregon Natural Resources Council,* —— U.S. ——, ——, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989) (applying 'arbitrary or

capricious' standard to consideration of decision not to supplement FEIS). Under this standard "a reviewing court may not set aside an agency [decision] that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Although "the ultimate standard of review is a narrow one," the court should not defer to the agency "without carefully reviewing the record and satisfying [itself] that the agency has made a *reasoned* decision based on its evaluation" of the information before it. *Oregon Natural Resources Council,* —— U.S. at ——, 109 S.Ct. at 1861 (emphasis added). A less searching approach "would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Id.*

The defendants rely on two references to the present record to substantiate the decision to restrict the analysis of secondary impacts to the four industries targeted in the Mallar Report.

First, the defendants point out that the "issue of secondary impacts was discussed in detail" at a February 13, 1986 meeting. FHwA Record, Vol. II, at 13. From the meeting notes it appears that the FHwA decided to analyze only those secondary impacts "which are reasonably foreseeable and made possible by the action and not possible without it," *id.* at 13 (notes by Bruce Mattson of FHwA), and that preproject proposals could be excluded from analysis on the basis that their location at Sears Island could not be considered attributable to the port project. *Id.* The meeting notes continue:

> The sub-consultants, Economic Research Associates *will be preparing a special report on Secondary Impacts [ERA Special Report].* The [ERA Special Report] will focus on those which are reasonably foreseeable and made possible by the action and not possible

without it. *The [ERA Special] report will be based,* inpart (sic), *on past studies* such as the "Municipal Resource Plan for the Industrial Development of Sears Island" prepared for the town of Searsport by Mallor (sic) Development Services, Inc., 1983. *Another informational source* is the "Sears Island Land Use Plan" prepared by the Bangor Investment Company (B.I.C.). *Other information is available and it is the consultant's responsibility to analyze all available information,* summarize it, and come up with a plan that can be reasonably attributed to the project for the foreseeable future.

*Id.* (emphasis added). *The ERA Special Report is not included in the administrative record made available to the court,* nor can the court locate anything in the administrative record which identifies the "other information" apparently available at the February 1986 meeting.

Second, the defendants cite to an affidavit prepared by William Richardson of the FHwA, stating that he

> reviewed that [Mallar] report and the MDOT rational (sic) for the selection of the four industries to be considered under secondary impacts. I discussed the issue with [Steve] Ronning [environmental policy specialist with FHwA] and [Bruce] Mattson [environmental engineer with FHwA] and I decided that the approach was reasonable.

The record discloses no explication of a reasoned basis for Mr. Richardson's conclusory statement, such as would enable the court to evaluate whether the FHwA made a rational evaluation of the information actually before it.[30] Perhaps most importantly, the record does not enable the court to determine that any consideration was given to the seemingly significant information apparently *not* before the agency.[31]

Although it was reasonable to analyze the environmental effects of the four types of industry targeted by the owner [BIC] of Sears Island in its marketing study report, *see* Corps Record, Vol. E4, at 3, there is nothing in the record, except *ipse dixit,* to demonstrate *an actual agency decision* to restrict the secondary impact analysis to these four types of potential industrial development, much less the rationale for such a decision. Yet reports were available indicating that industries with significant air or water impacts might locate in the Searsport area. *See* Advisory Committee on Coastal Development Report, FEIS, Vol. I, at 2–3; Letter from State Development Office, FEIS, Vol. II, at S–2.

Furthermore, even though *MDOT,* at the time of its 1983 environmental assessment, "expected" that forest product and food industries would locate near the new port, there is nothing in the administrative record to explain why these types of industries were omitted from the 1987 FEIS analysis of reasonably foreseeable secondary impacts of the proposed port project.[32] Moreover, from the inception of the EIS process it has been clear that it was anticipated that the forest product industry and, apparently, Maine's food and basic agricultural industries as well, would be prime beneficiaries of the port project. *See* Scoping Meeting Transcript, FHwA Record, Vol. I, at 28, Appendix A–5 (The project is "designed to provide the State of Maine

---

**30.** Although affidavits of agency decisionmakers may explain an administrative record and disclose actions not memorialized in the bare record, *Citizens to Preserve Overton Park,* 401 U.S. at 420, affidavits constitute *"post hoc"* rationalizations which must be viewed "critically." *Citizen Advocates For Responsible Expansion, Inc. v. Dole,* 770 F.2d 423, 434 (5th Cir.1985) (citing *Louisiana v. Lee,* 758 F.2d 1081, 1085 (5th Cir.1985), *cert. denied,* 475 U.S. 1044, 106 S.Ct. 1259, 89 L.Ed.2d 570 (1986)).

**31.** It is particularly noteworthy that the affidavit does not represent that Mr. Richardson considered the *ERA Special Report.*

**32.** It is especially difficult to understand the rationale for excluding "forest product and food industries" from secondary impact analysis, since "paper-making machinery and machinery components," as well as "forest product and food industries," are discussed in the same 1983 EA as industries "expected to have facilities on Sears Island," *Sierra Club I,* 769 F.2d at 878, and "non-electrical machinery and equipment" is one of the four targeted industries analyzed in the FEIS, *see* FEIS, Vol. I, at 4–109, 4–130.

with a modern port facility capable of handling both neobulk and containerized cargo and *recapturing the export trade for Maine's forest and food industry* products." (emphasis added)). *See also* FEIS, Vol. I, at 1–8 (one public purpose the cargo terminal is designed to serve is "[t]o facilitate the import and export movements of Maine-based industries, particularly forest products."). In 1980, the "Land Use Plan/Industrial Marketing Study," prepared for BIC, states that "[i]t is not anticipated that Sears Island would be a priority location for value-added forest products industries as locations nearer the raw materials or larger labor markets may be more appropriate." Corps Record, Vol. E4 at 3. Yet three years later MDOT was anticipating that forest product industries could locate in the industrial park. *See Sierra Club I,* 769 F.2d at 878 (discussing MDOT 1983 EA). Similarly, a later (1985) study prepared for BIC states that, although "[t]he market for industrial land on Sears Island is very uncertain[,]" one of the "principal advantages" of the island is that it is a "[g]ood location for manufacturing based on wood products exported via [the] State Pier (e.g. waterboard production)." Wallace, Floyd, Associates, Inc. "Sears Island Master Plan, Final Report" (1985) at 20–21. Corps Record, Vol. E4 at 10.

The secondary impact analysis required by NEPA is complicated by the conjectural enterprise of separating secondary impacts "definite enough to take into account," *Watt,* 716 F.2d at 952, from those "too speculative to warrant consideration," *id.* It is to be expected, therefore, that the dependability of the enterprise will be hampered by its admittedly amorphous mission. Yet judicial review is rendered utterly in-

feasible where the administrative record fails even to disclose whether information seemingly relevant to a rational secondary impact analysis was ever considered by the agency or, if so, how it was considered. The FEIS must be reviewed by the court (and therefore it must be prepared by the agency or its proxy) with a view to whether it would enable those whose responsibility it was to prepare it (as well as "those who did not have a part in its compilation," *Concerned Citizens,* 641 F.2d at 5 (quoting *Cummington Preservation Committee v. Federal Aviation Administration,* 524 F.2d 241, 244 (1st Cir.1975)), to give meaningful consideration to the relevant factors.

Although it is conceivable that a careful consideration of all available information could have enabled the FHwA rationally to conclude that the Mallar Report presented a logical basis for determining which industries were "reasonably foreseeable" and could be attributable to the Sears Island port project, the court cannot determine from the record that any such FHwA decision was "founded on a reasoned evaluation of the relevant information." *Oregon Natural Resources Council,* —— U.S. at ——, 109 S.Ct. at 1865. Therefore, plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the FEIS discussion of secondary impacts is "arbitrary and capricious." [33]

### 4. Supplemental EIS

The plaintiffs claim that the FHwA and the Corps violated NEPA regulations by failing to prepare a supplemental EIS addressing "significant new information on the acreage required for a six berth facili-

---

**33.** The present holding does not contravene *Concerned Citizens,* 641 F.2d at 5–6. In *Concerned Citizens,* the First Circuit held that an EIS which addressed the potential secondary impacts of highway construction in general terms was minimally acceptable where "industrial growth was highly speculative." *Id.* at 6. Although the First Circuit recognized that "using [something] as a 'selling point' without disclosing its possible negative aspects is certainly not the 'environmental full disclosure' called for by the NEPA," it found that the highly speculative nature of the possible impacts, combined with

the possibility of continuing opportunities to limit adverse effects, outweighed the dangers. *Id.* (quoting *Chelsea Neighborhood Ass'ns v. United States Postal Service,* 516 F.2d 378, 388 (2d Cir.1975)). The present record does not indicate that the FHwA considered the possibility that industries other than the "light-dry" type, or that food and forest product industries, might locate in a Sears Island industrial park. Consequently, there is no record upon which to assess whether it was rational to conclude that these types of industry are too speculative to require secondary impact analysis.

ty." [34] Complaint, at ¶ 35(h).

The FEIS states that the modern dry cargo terminal proposed for Sears Island "will be built on approximately 50 acres along the western shore" of Sears Island. FEIS, Vol. I. at ii. *See also id.* at 2–10, 4–3, A–39. The "50 acre" figure was predicated on the assumption that a six-berth terminal would be constructed. *See* FEIS Vol. I, at 4–3 ("full development of the cargo terminal would eliminate approximately 40 acres of wildlife habitat"); *id.* at 4–4 (construction of causeway and access road would affect 6.9 acres of wildlife habitat). Between the time the FHwA approved the FEIS and the time the Corps permit was issued,[35] MDOT's consultants increased their estimate of the acreage requirements of the ship loading and unloading facilities, at full buildout (six berths), to 124 acres, in response to inquiries from the Corps. *See* Answers to Corps Twenty Questions, Corps Record, Vol. II, at 27. The revised estimates for a two-berth and a four-berth terminal are 68 and 100 acres, respectively. *Id.*

■ The governing CEQ regulation requires that an agency prepare a supplemental EIS if:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are *significant new* circumstances or information *relevant to environmental concerns* and bearing on the proposed action or its impacts.

40 C.F.R. 1502.9(c)(1) (emphasis added).[36] Whether new information is "sufficiently significant" to warrant a supplemental EIS is left to the agency in the first instance. *Sierra Club v. United States Army Corps*

---

**34.** Plaintiffs have not pursued, and are deemed to have abandoned, their claim that the Corps violated NEPA by relying on studies and analyses conducted after completion of the FEIS.

**35.** The FHwA approved the FEIS on October 9, 1987 and issued its ROD approving the project on December 18, 1987. The Corps issued its ROD on March 14, 1988, and issued MDOT a permit on May 11, 1988. The revised acreage estimates were included in MDOT's December 30, 1987 letter responding to the twenty questions posed by the Corps.

Although the FHwA issued its ROD before the acreage estimates were revised, the agency has a continuing duty to "prepare supplements to either draft or final EIS's if there are 'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'" *Oregon Natural Resources Council,* — U.S. at —, 109 S.Ct. at 1858; *Stop H–3 Ass'n v. Dole,* 740 F.2d 1442, 1463 (9th Cir.1984), *cert. denied,* 471 U.S. 1108, 105 S.Ct. 2344, 85 L.Ed.2d 859 (1985)). *Accord Animal Defense Council v. Hodel,* 840 F.2d 1432, 1438 (9th Cir.1988) (citing *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023–24 (9th Cir.1980); *Enos v. Marsh,* 769 F.2d 1363, 1373 (9th Cir.1985)); *Friends of the River v. Federal Energy Regulatory Comm.,* 720 F.2d 93, 108 (D.C.Cir.1983) (noting that new information was of questionable value and stating that, "after prolonged consideration, FERC issued the ... license ...; review and reassessment of that decision, absent sufficient reason, should not continue indefinitely.") This duty continues until any stages of the project left to be completed would no longer be environmentally significant. *Oregon Natural Resources Council,* — U.S. at

— , 109 S.Ct. at 1858. ("[A]lthough 'it would make sense to hold NEPA inapplicable at some point in the life of a project, because the agency would no longer have a meaningful opportunity to weigh the benefits of the project versus the detrimental effects on the environment' up to that point," a supplemental EIS is necessary "when the remaining governmental action would be environmentally 'significant.'")

**36.** The implementing FHwA regulation states that

Supplements will be necessary when there have been significant changes in the proposed action, the affected environment, the anticipated impacts, or the proposed mitigation measures. However, a supplemental EIS will not be necessary if the Administration decides to fund an alternative adequately covered in the Final EIS but not identified as the proposed action. The decision to prepare a supplement to the FEIS shall not require withdrawal of the previous approvals for those aspects of the proposed action not directly affected by the changed condition or new information. A supplement is to be developed in the same manner (except that scoping is not required) as a new EIS (draft and final, with a ROD). 23 C.F.R. § 771.129(b).

The corresponding Corps regulation states: A supplement to the draft or final EIS on file will be prepared whenever significant impacts resulting from changes in the proposed plan or new significant impact information, criteria or circumstances relevant to environmental considerations impact on the recommended plan or proposed action as discussed in 40 CFR 1502.9(c). 33 C.F.R. § 230.11(b).

*of Engineers,* 701 F.2d 1011, 1037 (2d Cir. 1983). A reviewing court determines the lawfulness of an agency decision not to supplement an EIS by asking whether that decision was "arbitrary or capricious." [37] *Oregon Natural Resources Council,* — U.S. at ——, 109 S.Ct. at 1861 & n. 23.

### a. *Environmental Significance*

■ An agency is not required to prepare a supplemental EIS in response to every change in circumstances that occurs after its approval of an FEIS, *see Sierra Club v. Froehlke,* 816 F.2d 205, 210 (5th Cir.1987); *Vine Street Concerned Citizens, Inc. v. Dole,* 630 F.Supp. 24, 27 (E.D. Pa.1985); the "new circumstances must present a *seriously* different picture of the environmental impact of the proposed project from what was previously envisioned," *Froehlke,* 816 F.2d at 210 (emphasis in original) (citing *Wisconsin v. Weinberger,* 745 F.2d 412, 421 (7th Cir.1984)). A change may be significant in "either qualitative or quantitative terms." *Environmental Defense Fund v. Marsh,* 651 F.2d

983, 996 (5th Cir.1981). *See Vine Street Concerned Citizens, Inc. v. Dole,* 630 F.Supp. at 29 (evaluating whether projected increase in traffic was "quantitatively or qualitatively" different from that considered in FEIS).

■ MDOT argues that the revised acreage estimates would not significantly affect the FEIS analysis of the environmental effects of the Sears Island project because the FEIS as a whole did consider the environmental effects of a terminal facility requiring *more than* 124 onshore acres. The defendants maintain also that, given the size of Sears Island, this "minor" increase in acreage requirements would represent an insignificant alteration to the environmental landscape.

The plaintiffs and MDOT disagree as to the number of onshore acres [38] considered in the FEIS.[39] MDOT maintains that the FEIS considers the "following 'onshore acres ... to support ship loading and unloading' facilities for a *two berth* facility: 71.5 [40] acres plus a 60 to 150 acres industri-

---

**37.** The Supreme Court noted that
several Courts of Appeals, including the Court of Appeals for the Ninth Circuit [in *Oregon Natural Resources Council v. Marsh,* 832 F.2d 1489, 1494 (9th Cir.1987) ] .., have adopted a "reasonableness" standard of review [for consideration of agency decisions not to issue a supplemental EIS], *see, e.g., Sierra Club v. Froehlke,* 816 F.2d 205, 210 (CA5 1987); *Enos v. Marsh,* 769 F.2d 1363, 1373 (CA9 1985); *National Wildlife Federation v. Marsh,* 721 F.2d 767, 782 (CA11 1983); *Massachusetts v. Watt,* 716 F.2d 946, 948 (CA1 1983); *Monarch Chemical Works Inc. v. Thone,* 604 F.2d 1083, 1087–1088 (CA8 1979), ... This standard, however, has not been adopted by all of the Circuits. *See, e.g. Wisconsin v. Weinberger,* 745 F.2d 412, 417 (CA7 1984) (adopting "arbitrary and capricious" standard). Moreover, as some of these courts have recognized, the difference between the "arbitrary and capricious" and "reasonableness" standards is not of great pragmatic consequence. *See Manasota–88, Inc. v. Thomas,* 799 F.2d 687, 692, n. 8 (CA11 1986) ("As a practical matter, ... the differences between the 'reasonableness' and 'arbitrary and capricious' standards of review are often difficult to discern"); *River Road Alliance, Inc. v. Corps of Engineers of United States Army,* 764 F.2d 445, 449 (CA7 1985) ("we are not sure how much if any practical difference there is between 'abuse of discretion' and 'unreasonable'"), *cert. denied,* 475 U.S. 1055, 106 S.Ct. 1283, 89 L.Ed.2d 590

(1986). Accordingly, our decision today will not require a substantial reworking of long-established NEPA law.
*Oregon Natural Resources Council,* — U.S. at ——, 109 S.Ct. at 1861 n. 23.

**38.** The plaintiffs originally argued that a supplemental EIS was necessary because a six-berth facility will require 124 acres of upland (acreage *on* Sears Island), rather than the 40 acres considered in the *FEIS.* Plaintiffs now appear to concede that the *revised acreage estimate* means that the cargo terminal will require 124 "onshore" acres at full (six-berth) buildout, and that "onshore" acreage includes "upland" acreage, *as well as* intertidal and subtidal lands to be filled during project construction (filled land). The *FEIS* evaluates the following "onshore acres" in connection with a six-berth facility: 40.3 upland acres, 9.1 intertidal acres and 23.3 subtidal acres, for a total of 72.7 "onshore" acres. *See* FEIS, Vol. I, at 4–5, 4–44.

**39.** Although they do not concede that plaintiffs' "figures and assumptions are correct," the federal defendants argue that the increase is not significant even if plaintiffs' figures are correct.

**40.** MDOT supports its contention that the FEIS evaluated 71.5 onshore acres in connection with the two-berth facility by stating that "[t]he 79.5 (sic) acre figure is computed as follows: 47.2 acres of wildlife habitat (Final EIS, Vol. I at

al park," and that an additional 8.1 acres of filled land was considered in connection with a *six-berth* facility. MDOT Supplemental Memorandum, at 126 (emphasis added). MDOT maintains that these figures demonstrate that the FEIS did consider the environmental impacts on more than 124 onshore acres and, therefore, that no supplemental EIS was necessary.

The plaintiffs respond that MDOT incorrectly includes the 60 to 150 acres originally considered necessary for the industrial park in its computation of the acreage evaluated by MDOT in connection with the six-berth *terminal.* Plaintiffs maintain that the highest acreage figure mentioned in the FEIS for *terminal* use (including the pier and related onshore terminal facilities) is 72.3 acres.[41] Plaintiffs' claim may not be defeated simply by asserting that the FEIS *did* consider the environmental significance of a terminal requiring 124 acres at full (six-berth) buildout on the theory that the FEIS analyzed the environmental significance of an industrial park requiring 60 to 150 acres, *together with* a terminal originally expected to require approximately 71.5 acres.

The environmental impact on wildlife habitat differs depending on the use to which the habitat will be put when developed. It appears that construction and operation of the terminal would cause a complete loss of wildlife habitat and carrying

capacity on each acre utilized, *see* FEIS, Vol. I, at 2–20, whereas the FEIS anticipates that construction of a 160–acre industrial park would "actually disturb" only 65 acres of wildlife habitat,[42] *see* FEIS, Vol. I, at 4–114. In any event, even assuming similar impact *levels* the FEIS does not evaluate the impact on the total wildlife habitat area now believed necessary for a 124–acre terminal facility *and* a 160–acre industrial park.

Although the FEIS did not consider the acreage requirements for the overall Sears Island port project, defendants argue that the use of 50 additional upland acres for terminal operations would not significantly alter the environmental analysis. With respect to the 40 acres of upland habitat expected to be affected by the terminal facility itself, the FEIS states that "practically all of the habitat loss would be hardwood and mixed hardwood spruce forests, the two most abundant types on the island." FEIS, Vol. I, at 4–6. The FEIS characterizes the habitat at the proposed industrial park as "primarily second growth forest, namely hardwood dominated forest, mixed-hardwood-spruce forest and softwood-dominated forest." FEIS, Vol. I, at 4–114. Based on their assumption that full (six-berth) terminal buildout could be accomodated in the area of the planned industrial park,[43] the defendants now argue

---

4–4) [the 47.2 acre figure includes 40.3 acres for the terminal site and 6.9 acres for the highway and railroad connecting the terminal site with the causeway] plus 24.3 acres of filled marine habitat (Final EIS, Vol. I at 4–44)." MDOT Supplemental Memorandum, at 126 n. 111. But the FEIS appears to relate the 47.2 acres of wildlife habitat to a *six-berth* facility. *Compare* FEIS, Vol. I, at 4–1 ("In all cases, impacts relate to the full development of the terminal unless specifically stated otherwise."), *and id.* at 4–3 ("*Full development* of a cargo terminal would eliminate approximately 40 acres of wildlife habitat at the Sears Island project site.") (emphasis added), *with id.* at 4–4 (Table 4.2–1 containing the following acreage figures *without* specifying that they applied to a two-berth facility: 40.3 total acres of wildlife habitat impacted at terminal site, 6.9 acres impacted by highway and railroad.).

**41.** Plaintiffs state that "Tables (sic) 2.3.2 lists 40 upland acres, 3 intertidal acres and 23 subtidal acres, totaling 76 acres for the pier and cause-

way. Deducting 3.7 acres for the causeway, leaves 72.3 acres for the pier." The FEIS does not contain a Table 2.3.2. Table 4.2–1 states that the terminal itself would affect 40.3 acres of wildlife habitat at full buildout, and Table 4.9.1 states that a total of 24.3 marine acres (9.1 intertidal and 15.2 subtidal acres) will be filled, and that an *additional* 3.7 acres will be filled for the causeway. Accordingly, it appears that plaintiffs incorrectly deducted 3.7 acres.

**42.** The remaining 95 acres in the fully developed industrial park would continue to provide some wildlife habitat, "although the fragmentation of habitat would lower its value for some wildlife species." FEIS, Vol. I, at 4–115. These acres would provide "suitable habitat for a variety of song birds and both small and medium-size mammals." *Id.*

**43.** The defendants make this assumption on the strength of the affidavit of Ron Elder, Director of the MDOT Division of Ports and Marine

*to the court* that since hardwood and mixed hardwood-spruce forests are the most abundant habitat types on Sears Island, loss of an additional 50 acres of that type of habitat would not present a "seriously different picture of the environmental landscape," *Weinberger,* 745 F.2d at 418. *See* Federal Defendants' Reply to Plaintiffs' Objections to Defendants' Motions for Summary Judgment, at 15; MDOT's Supplemental Memorandum, at 126–27. The plaintiffs respond that a supplemental EIS is required because the increased acreage estimate represents a "71.5% change" in the projected scale of the terminal facility.

" '[S]ignificant[ ]' [is] a chameleon-like word that takes its functional meaning from its context." *Environmental Defense Fund,* 651 F.2d at 992. Although a substantial increase in project scale might not, in and of itself, be of sufficient significance to require a supplemental EIS, courts have held that large increases in project scale place decisionmakers under a duty to investigate whether it is likely that there would be a significant change in the environmental picture. *See Louisiana Wildlife Federation v. York,* 761 F.2d 1044 (5th Cir.1985) (Corps previously considered effects of clearing about half the needed land, based on representations of landowners that remaining land would be cleared whether or not project went forward; when later Fifth Circuit decision called assumption into doubt, Corps was ordered to reconsider assumption); *Environmental Defense Fund,* 651 F.2d at 1006 (directing preparation of supplemental EIS due in part to 50% increase in projected land requirement).

The FEIS contains no analysis of the particular environmental effects of a Sears Island port project consisting of a 124–acre cargo terminal *and* a 160–acre industrial park. Although there is no *direct* record evidence that any environmental effects attributable to the larger complex would differ in a *qualitative* sense from the impacts considered in the FEIS, at some point the cumulative environmental effects of enlarging the scale of a project may effect qualitative environmental change both inside and outside the project area, particularly the aural and visual effects of an enlarged facility.

b. *Agency Consideration*

Whether an agency decision not to prepare a supplemental EIS is considered "arbitrary and capricious" depends in part on the "degree of care with which the agency considered the information and evaluated its impact, and the degree to which the agency supported its decision not to supplement with a statement of explanation or additional data." *Watt,* 716 F.2d at 950 (quoting *California v. Watt,* 683 F.2d 1253, 1267–68 (9th Cir.1982) (*rev'd on other grounds sub nom. Secretary of Interior v. California,* 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984))).

In *Oregon Natural Resources Council,* a unanimous Supreme Court held that a court "should not automatically defer" to an agency decision [not to prepare a supplemental EIS], but must satisfy itself "that the agency has made a reasoned decision based on [the agency's] evaluation" of the possible significance of the new information. —— U.S. at ——, 109 S.Ct. at 1861. The Court found that a "contrary approach [to review of an agency decision not to issue a supplemental EIS] would not simply render judicial review generally meaningless, but would be contrary to the demand that courts ensure that agency decisions are founded on a reasonable evaluation of the relevant factors." *Id.* The Court upheld a Corps decision not to prepare a supplemental EIS, where the agency "carefully scrutinized" the new information and retained two independent experts to evaluate it. *Id.* at ——, 109 S.Ct. at 1863–64. The Court stated that "regardless of [the Corps'] eventual assessment of the significance of [the new] information, the Corps had a duty to take a hard look at the proffered [new] evidence," but having tak-

Transportation, which concludes that "[t]he need for additional land at a future date *could* be provided due to the proximity of the planned industrial park...." Elder Aff., at ¶ 10 (emphasis added).

en the required "hard look" the Corps had met its responsibility. *Id.* at ——, 109 S.Ct. at 1865.

### i. The FHwA

■ When new information comes to light after approval of a FEIS, NEPA requires that the agency *"consider* and *evaluate* [the] ... information ... and make a *reasoned determination"* about its environmental significance. *Animal Defense Council,* 840 F.2d at 1438 (emphasis added). Additionally, the FHwA regulations require that

> [i]f any changes are made to the proposed action and it is uncertain if a supplemental EIS is required, the applicant will develop appropriate environmental studies or, if necessary, an EA to assess the impacts of such changes. If it is determined that the changes result in significant environmental impacts which could not be identified from reviewing the initial EIS, a supplemental EIS will be prepared. If no supplemental EIS is required after the studies or EA required by this subsection have been made, the Administration shall so indicate in the project file.

23 C.F.R. § 771.129(d).

The only evidence relating to the FHwA decision not to prepare a supplemental EIS are the statements contained in the affidavit of William Richardson:

> A meeting was held on December 1, 1987, among the FHWA, cooperating agencies, MDOT and respective consultants to discuss the comments on the final EIS. The ACOE presented a list of 20 questions relating to the comments that it asked MDOT to answer. Although I did not attend that meeting, I received and reviewed a copy of the questions and MDOT's responses. (FHWA Record at Vol. III–36).
>
> Meetings of cooperating agencies were held thereafter in response to proposed actions of the ACOE on the permit application. Although FHWA's involvement in the process formally ended with the issuance of its decision, I did receive and evaluate materials generated by the EPA consultant TBS for that subsequent ACOE process. Those materials specifically included a February 16, 1988 document entitled "Comments on Maine DOT Responses to Corps of Engineers Questions Concerning the Proposed Marine Terminal at Searsport, Maine" (FHWA Record at Vol. IV–7). My *review* of that material indicated to me that it was a *restatement* of *previously presented data* and arguments. I did not believe it even remotely sufficient to trigger the need for supplemental EIS.

Richardson Aff., at ¶¶ 42–44 (emphasis added).[44] As a *post hoc* rationalization of the agency decision not to issue a supplemental EIS, Mr. Richardson's affidavit is to be viewed "critically." *Citizen Advocates For Responsible Expansion,* 770 F.2d at 434; *see* note 30 *supra.*

The Richardson affidavit does not provide the kind of detailed explanation contemplated by NEPA; it neither evinces careful consideration of the decision not to prepare a supplemental EIS, nor the rationale for the decision, much less that the agency evaluated specific potential impacts. The administrative record does not

---

**44.** The TBS comments on the revised acreage estimates did not address the environmental significance of the new information.

> Mr. Olko's analysis of land requirements for the terminal is based on an idealized design that permits unconstrained expansion up to a six berth facility handling wood chips and other unspecified commodities. Searsport does not require this level of terminal capacity. There is little likelihood of attracting sufficient traffic to fully utilize a two berth facility. The EIS does not include any demand analysis greater than 185,116 short tons (which TBS believes is overstated). Forecasts of traffic that require wood chip handling or a

> high technology/high productivity automated terminal were not included in the EIS.
> It is fully acknowledged by TBS that the MP site is not optimal and would require careful engineering and planning to maximize its potential. However, based on the BAH forecast for breakbulk and container traffic to the year 2010, there is sufficient space to handle that traffic using only two berths. The example of Bridgeport cited in 4. above shows that a site with 140 percent of the space at M.P. was able to handle 284 percent of the maximum traffic forecasted for Searsport.

TBS Report, FHwA Record, Vol. IV, at 7.

reveal that either the *qualitative* or the *quantitative* environmental effects of a larger port-industrial park complex were carefully assessed before the FHwA concluded that a supplemental EIS was not necessary. Absent such evidence, the revised acreage estimates may present "a picture of the likely environmental consequences associated with the [Sears Island project] not envisioned by the [FEIS]." *Louisiana Wildlife Federation,* 761 F.2d at 1051 (quoting *Weinberger,* 745 F.2d at 418).

The court has discovered only one case upholding an agency decision not to issue a supplemental EIS where the agency had not considered the potential significance of the new information. In *Friends of the River,* the District of Columbia Circuit upheld a Federal Energy Regulatory Commission [FERC] decision not to issue a supplemental EIS to consider new electricity-demand projections:

> [Plaintiff's] new information ... appears to be of questionable value. Even if the information were somewhat more weighty, however, we would hesitate to command FERC to attend to it. CEC, as part of its continuing task of surveying California's energy picture, issues new forecasts and predictions every few months, each soon to be superseded by the next. Were we to order the Commission to reassess its decisions every time new forecasts were released, we would risk immobilizing the agency.... After prolonged consideration, FERC issued the ... license ..; review and reassessment of that decision, absent sufficient reason, should not continue indefinitely.

720 F.2d at 109. The present situation is clearly distinguishable. No party contests the accuracy of the new information, nor is it the type of information which is likely to be superseded in the near future.

NEPA is an environmental "full disclosure" law. The supplemental EIS process is designed to ensure that agencies act with "complete awareness ... of the environmental consequences of [their] action[s]." *Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 961 (1st Cir.1976)

(citation omitted), *aff'g,* 399 F.Supp. 208 (D.Mass.1975) (ordering supplemental EIS despite inability to determine, as a matter of law, that new information would have significant environmental effect; but public should have opportunity to analyze and assess it). Absent exceptional circumstances, an agency decision not to prepare a supplemental EIS will be upheld only where the agency carefully evaluated the impact of the new information, and its decision is supported by a rational explanation or additional data. *See, e.g., Oregon Natural Resources Council,* —— U.S. at ——, 109 S.Ct. at 1865 (no supplemental EIS required where Corps hired experts to evaluate significance of new information); *Froehlke,* 816 F.2d at 210–212 (no supplemental EIS necessary where Corps considered new information in a 'Supplemental Information to Post–Authorization Change Report,' which was made available for public review and comment); *Animal Defense Council,* 840 F.2d at 1438–39 (decision not to issue supplemental EIS reasonable where it was "clear that the agency considered and evaluated" the changed circumstance and its *effects on all previously rejected alternatives* ); *California v. Watt,* 683 F.2d at 1268 (no supplemental EIS needed where agency document considered environmental impacts based on new data, document provided detailed explanation of decision not to issue supplemental EIS, and document was made available for public comment); *Vine Street Concerned Citizens,* 630 F.Supp. at 27 (decision not to issue supplemental EIS reasonable where agency evaluated significance of new information); *Pennsylvania Protect Our Water and Environmental Resources, Inc. v. Appalachian Regional Commission,* 574 F.Supp. 1203, 1227 (M.D. Pa.1982) (same).

Plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the FHwA decision not to issue a supplemental EIS was "arbitrary and capricious."

#### ii. The Corps

██ The revised acreage requirements were acknowledged in MDOT's response to two questions raised by the Corps during

its review of MDOT's application for a permit under the Clean Water Act:

> To what extent is there enough room on Mack Point to accommodate 2–4–6 berths? What are the operational limitations and can these be quantified? How do they compare to Sears Island, and what do any differences mean? EPA says differences are marginal in terms of other critical factors which likely will not be met.

> Are there any accepted standards, guidelines or recommendations for pier and storage area for certain commodities for modern terminals? i.e. How much land is recommended for 2 berth, 6 berth? What's exactly available at Mack Point? And where is it? Does EIS map of Mack Point 6–berth configuration really reflect enough land? Could wetland impacts on Mack Point be further avoided, as the Agencies believe, and still allow enough room for the backland storage? And would any additional movements mean more inefficiencies? How does that impact the practicability of the entire project?

Corps Record, Vol. III, at 82.

The Corps used the revised acreage estimates in arriving at its decision that the space available at Mack Point is inadequate to accommodate a cargo terminal suitable to MDOT's purposes and needs. Corps ROD, at 21–22 (Corps Record, Vol. III, at 58). But the Corps ROD neither evaluates the revised acreage estimates with a view to their environmental significance, nor does it address the significance of the fact that the additional acreage requirements were not recognized until after publication of the FHwA FEIS adopted by the Corps. The Corps ROD states that "[t]he Corps finds that the 1987 FHwA EIS is adequate and a Supplemental EIS is not required." Corps ROD, at 24 (Corps Record, Vol. III, at 58). The only evidence on the record explaining the Corps decision not to prepare a supplemental EIS is the affidavit of William Lawless, Chief of the Regulatory Branch of the Corps' New England Division Operations Division:

> MDOT submitted responses to the "20 Questions," which responses in turn were critiqued by TBS, the consultant for the EPA. I reviewed all of the responses filed, as did the Project Manager.

> In my opinion, the substantive responses to the "20 Questions" expanded upon previously submitted information. In large part, the submissions on both sides were discussions based upon previously submitted data. They did not raise any issues or present any new information which, in my opinion, triggered the requirement for a supplemental EIS or for other additional analysis of MDOT's application.

Lawless Aff., ¶¶ 32–33. The Lawless affidavit does not demonstrate that the Corps carefully evaluated the environmental significance of the revised acreage estimates, nor does it explicate the Corps decision not to issue a supplemental EIS. *See* Section II.A.4.b.1. *supra.*

The plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the Corps decision not to require a supplemental EIS was "arbitrary and capricious."

### 5. Reasonable Alternatives

NEPA requires that federal agencies "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," 42 U.S.C. § 4332(2)(E), even if an EIS is not required. If an EIS is required, it must include an analysis of all reasonable alternatives to the proposed action. 42 U.S.C. § 4332(2)(C)(111).

NEPA regulations describe the significance and purpose of the EIS discussion of alternatives:

> This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues

and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14.

The plaintiffs assert that the FHwA failed to consider, and failed to discuss in the FEIS, a *nonexpandable* two-berth dry cargo terminal as an alternative to the proposed two-berth terminal *expandable* to six berths.[45] Plaintiffs argue that a *nonexpandable* two-berth terminal is a reasonable alternative because available information indicates that it may not be necessary to build, economically feasible to operate, or possible to fund, more than two berths. Plaintiffs point in particular to the cargo projections of Temple, Barker & Sloane [TBS], a consultant hired by EPA, which suggest that the cargo estimates submitted by Booz–Allen, MDOT's consultant, are flawed because Booz–Allen relied on the unsupported assumption that vessel service, port costs, and ocean costs at the proposed cargo terminal could be competitive with those at competing ports. *See* Temple, Barker & Sloane, A Review of

Current and Future Dry Cargo Handling Capabilities at Mack Point, at 5 (FHwA Record, Vol. III, at 10). Even if Booz–Allen's cargo estimates are sound, plaintiffs contend that the record demonstrates that a two-berth facility could handle all projected cargo through the year 2010. Plaintiffs point also to the fact that funding has not been authorized for the construction of more than two berths.

The role of the court is not to determine which expert to believe, TBS or Booz–Allen, but whether the decision to analyze *only* a two-berth terminal facility *expandable* to six berths was a rational one. *Sierra Club,* 701 F.Supp. at 923. The court invited the parties to address

whether, under NEPA, the reasonableness of any alternative is to be measured against general project goals similar to those enunciated in the FEIS, *cf. Van Abbema v. Fornell,* 807 F.2d 633, 638 (7th Cir.1986), or against the scope of the proposed project in its initial phase. Subsidiary issues which should be discussed include the extent to which it is the prerogative of the applicant to prescribe the type, dimensions and goals of the project under NEPA; whether by proposing a two-berth facility, with the capacity for expansion to six berths, MDOT is entitled to have exactly *that* proposal *evaluated* under NEPA; or whether the present and future economic assumptions upon which MDOT based its proposal must be evaluated with a view to assessing their economic viability, thereby enabling the reviewing agency (and court) to distinguish legitimate project typing and scoping from pretextual proposals designed to render otherwise "reasonable alternatives" unnecessary of evaluation in the EIS.

*Sierra Club,* 701 F.Supp. at 923 (emphasis in original).

### a. *Defining Project Purposes*

██ The defendants argue that alternatives which will not satisfy the "applicant's

---

**45.** In their amended complaint, plaintiffs allege also that the EIS should have considered other means of stimulating the economy of Waldo County. Plaintiffs still fail to suggest "even a facially plausible alternative for improving the economy of Waldo County that would meet *both* of the goals of the project planners." *Sierra Club,* 701 F.Supp. at 919. Therefore, plaintiffs have not demonstrated a likelihood of success on the merits of this claim.

stated goals or needs are not reasonable" and need not be considered. Supplemental Memorandum of Law for the Federal Defendants and Motion for Summary Judgment, at 60; *see* MDOT Supplemental Memorandum, at 120–122. Defendants maintain that MDOT proposes to construct a "two berth, modern, competitive port facility *with expansion capability,*" MDOT Supplemental Memorandum, at 121, and that, under NEPA, federal decisionmakers need only examine alternatives tailored to the applicant's proposal. The federal defendants argue further that FHwA's consideration of reasonable alternatives must be upheld because the FHwA, as well as the Corps, went beyond NEPA requirements and considered the economic viability of the MDOT's proposal.[46]

The authorities are clear that in order for an EIS to be "more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility." *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council,* 435 U.S. 519, 551, 98 S.Ct. 1197, 1215, 55 L.Ed.2d 460 (1978); *see Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1074 (1st Cir.1980). The feasibility component is concerned with whether a particular alternative can meet the goals of the proposed action. *See, e.g., Van Abbema v. Fornell,* 807 F.2d at 635; *Louisiana Wildlife Federation,* 761 F.2d at 1048; *Roosevelt Campobello International Park Commission v. United States Environmental Protection Agency,* 684 F.2d 1041, 1047 (1st Cir.1982); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 436 (5th Cir.1981); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1286 (9th Cir.1974); *Residents in Protest–I–35E v. Dole,* 583 F.Supp. 653, 660 (D.Minn.1984).

The CEQ offers the following guidance concerning limitations on an applicant's power to prescribe the project criteria for use in considering the feasibility of alternatives: Although "[t]here is no ... need to disregard the applicant's purposes and needs and the common sense realities of a given situation in the development of alternatives," *CEQ Guidance Regarding NEPA Regulations,* 48 Fed.Reg. 34263 (July 28, 1983), "[r]easonable alternatives include those that are *practical or feasible* from the technical and economic standpoint and using common sense, rather than simply *desirable* from the standpoint of the applicant," *CEQ Forty Questions,* 46 Fed. Reg. at 18027 (emphasis in original).

In *Residents in Protest–I–35E,* the court considered allegations that the applicant-EIS preparer placed too much emphasis on transportation goals and not enough on environmental concerns when identifying alternatives to a proposed highway project. 583 F.Supp. at 660. The court agreed that "it is not permissible to define the goals [of a project] in such a manner so as to preordain the outcome," but stated that the applicant's project criteria were entitled to "some weight," *id.,* in evaluating the viability of alternatives. The court held that "[s]ince a reasonable alternative is one which serves the *underlying goals* of a project, and the project under consideration involved transportation, it is only natural that transportation policies would dominate." *Id.* (emphasis added) (citation omitted). As the alternative proposed by the plaintiffs would not serve "[o]ne of the primary local needs the [project] was designed" to address (ready access from airport to business district), and would have encouraged through-traffic in residential

---

46. The federal defendants cite *Anson v. Eastburn,* 582 F.Supp. 18 (S.D.Ind.1983), in support of their argument that NEPA is not an economic statute that requires the agency to undertake in-depth review and independent evaluation of the economic assumptions that underlie the stated purposes and needs of the applicant. *Anson* held that the Corps was not required to *investigate independently* (as opposed to *evaluate*) information provided by the applicant for use in the "purpose and needs" section of the Corps EIS.

In the present case the federal agencies are relying on economic information to support their decision not to evaluate its environmental effects. The CEQ contemplates that an EIS preparer evaluate an alternative with a view to whether it can satisfy the economic and technical needs and purposes of the applicant. *See CEQ Forty Questions,* 46 Fed.Reg. at 18027 ("Reasonable alternatives include those that are *practical* or *feasible* from the technological and economic standpoint.")

neighborhoods, the court found that it was not a reasonable alternative. *Id.*

Similarly, in *Van Abbema* the Seventh Circuit focused on the applicant's *underlying* goals in order to ascertain whether the Corps had met its obligation to evaluate project alternatives under NEPA and the CWA.[47] 807 F.2d at 638–43. The applicant in *Van Abbema* proposed to construct a facility to "transload coal from trucks to barges on the Mississippi River." 807 F.2d at 635. The Seventh Circuit noted, at the "outset ..., that the evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the *general* goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals." *Id.* at 638 (emphasis in original). The court assessed the suggested alternatives in terms of their comparative suitability to serve the general goal of delivering "coal from mine to utility."[48] *Id. See also Coalition For Canyon Preservation v. Bowers,* 632 F.2d 774, 783 (9th Cir.1980) (improvement of two-lane road reasonable alternative to proposed four-lane highway); *Trout Unlimited,* 509 F.2d at 1286 (identifying primary goals of Teton Dam and Reservoir Project as flood control and establishment of irrigation water source); *Van de-Kamp v. Marsh,* 687 F.Supp. 495, 497, 499 (N.D.Cal.1988) (as alternatives to airport's proposal to fill land for use by two air cargo handling facilities, provide "additional land for rental car parking, corporate aircraft parking and maintenance, a telecommunications facility, a third commercial air terminal, and other ancillary facilities," Corps should consider relocating some or all of air cargo project at other airports and adapting project to accommodate but one air cargo company).

Although the defendants argue that MDOT's primary project objective is a modern, efficient, competitive two-berth terminal, *with expansion capability,* the document prepared by Normandeau Associates for the EIS scoping meeting merely states that "[t]he proposed project is designed to provide the State of Maine with a modern port facility capable of handling both neobulk and containerized cargos, and recapturing the export trade for Maine's forest and food industry products." FHwA Record, Vol. I, at 28, Appendix A–5. Similarly, the FEIS fails to particularize (or substantiate) terminal *expansion capability* as a general goal of the project. The FEIS states that the proposed project comprises one component of the State of Maine's larger strategy to improve the efficiency of its transportation system through selected infrastructure and other investments, consistent with the State's goals of preserving and enhancing its invaluable environmental resources. This strategy is intended to ensure the long-term viability and expansion of the State's economy, especially in specific regions where chronic unemployment and underemployment warrant public action to help mitigate social disadvantages. FEIS, Vol. I, at 1–1.

The FEIS identifies the "general goals" of the project as "1) creat[ion of] a modern,

**47.** Consideration of alternatives differs under NEPA and the CWA. The CWA focuses on *"practicable* alternatives," 40 C.F.R. § 230.10(a), whereas NEPA focuses on *"reasonable* alternatives," 40 C.F.R. § 1502.14.

The criteria for determining whether an alternative is practicable under the EPA wetlands regulations are similar to the factors for determining whether an alternative is reasonable under NEPA; consideration of cost, existing technology, and logistics in light of overall project purposes would seem to be required under both. *Compare* 40 C.F.R. § 230(a)(2) (1987) *with* CEQ *Forty Questions,* Fed.Reg. at 18026, *and Roosevelt Campobello,* 684 F.2d at 1047. The effect of the determination, however, is different under the two acts. Under NEPA, a determination that an alternative is reasonable requires that the agency examine fully the environmental impacts of that alternative in the EIS, even though the alternative may ultimately be rejected. Under the EPA wetlands regulations, a determination that an alternative is practicable requires the agency to select that alternative over any other, including a preferred alternative, which would have greater adverse impact on the aquatic ecosystem, so long as the "practicable alternative" does not have other significant adverse environmental consequences. *Sierra Club,* 701 F.Supp. at 920 n. 18.

**48.** The proposed facility was part of the applicant's overall plan to truck coal from an Illinois mine, transload it onto barges, and tow the barges to an Iowa power plant. 807 F.2d at 635.

efficient cargo facility that will enhance the economic competitiveness of central Maine industries, and 2) provi[sion of] additional employment in a region of the State where chronic unemployment is a significant problem." *Id.* The FEIS further identifies seven "public purpose objectives" the State of Maine considers in its evaluation of cargo port facility investments.[49]

- To facilitate the import and export movements of Maine-based industries, particularly forest products;
- To generate jobs and other economic activity within Maine in the service of these industries' import and export movements;
- To help induce additional jobs and economic activity within Maine, particularly to the extent that proximity to a modern cargo handling facility might offer extant or new industry a competitive location advantage;
- To target state investments in port facilities, to the extent practical given other criteria, in an area(s) where new jobs and economic activity are most needed;
- *To include long-term as well as current transportation and economic*

*development potentials as site location and facility design considerations;*

- To consider possible disruption to existing social and economic activities caused by construction of a new facility, or re-construction/rehabilitation of existing facilities; and
- To target port facilities development in coastal areas designated for controlled heavy industrial uses, so as to preserve and enhance coastal environmental resources generally.[50]

*Id.* at 1–8 to 1–9 (emphasis added).

Although the FEIS identifies the ability to fulfill long-term project needs as an objective, the only specific mention that an expansion capability *to six berths* is essential to the project is found in documents prepared *after* the FEIS was approved. The affidavit of William Lawless of the Corps states:

When a question was raised during the processing of MDOT's application whether the purpose of the project somehow had been altered in mid-stream in order to make expandability a new part of the criteria, I personally verified the project

**49.** In its summary of the purpose of the project, the FEIS identifies five objectives:

1) to provide transportation cost savings to Maine-based industries, especially the forest product industry, through reduced overland travel distances to a port, 2) to generate direct jobs and other economic activity within Maine related to the import-export traffic, 3) to induce indirect jobs and economic activity in Maine-based industries benefiting by proximity to a modern port, 4) to target State investments in port facilities where new jobs and economic activity is most needed, and 5) to concentrate economic development along Maine's coastline in localized area to protect the environmental values of the coastline consistent with State environmental and conservationist objectives.

FEIS, Vol. I, at 11.

The FEIS states that the port project is principally expected to

1. Generate sufficient cargo volume in the near term to benefit Maine's industry through shipping cost savings and cover port operating costs within acceptable limits for the policy objectives of the State;

2. Provide long-term incentives for the expansion of Maine industries' international trade within a broad hinterland encompassing

northern, central, and western portions of [Maine] (*including expansion potential to accommodate deep draft vessels of the future*);

3. Cause a minimum of disruption to existing industry, and particularly, induce no job dislocations within economically depressed Waldo County;

4. Provide immediate and near term employment opportunties (sic) for Waldo County and other state residents via the project's construction and operation; and

5. Create a positive context for future economic development, particularly within Waldo County, because of the marine terminal's immediate proximity to industrially developable land.

*Id.* at 1–9 to 1–10 (emphasis added).

**50.** These objectives appear to have been stated for the first time at a February 12, 1986 meeting attended by representatives of MDOT, FHwA, Normandeau Associates, ERA, Corps, Town of Searsport, FWS, and various state environmental agencies. *See* FHwA Record, Vol. II, at 12. At the meeting, Vern Lang of FWS and Russ Bellmer of the Corps "both cautioned that these objectives should not be defined so narrowly that they appear to be tailored to fit only Sears Island." *Id.*

purpose and the fact that it had not changed in order to eliminate alternatives subject to consideration. In this instance, I asked Commissioner Connors of MDOT, the project sponsor, what he considered the project purpose to be. He affirmed that the purpose of the project was to provide a modern and efficient port facility in the Central Maine Region with expansion potential up to six berths. Based upon my experience in port design, the project purpose presented by MDOT appeared both valid and reasonable.

Lawless Aff., at ¶ 13.[51] The Corps ROD also discusses terminal expansion capability as a project purpose: "[t]he project purpose is to construct a modern port facility that is efficient and expandable to meet both current and future needs of the State." Corps ROD, at 17, Corps Record, Vol. III, at 58. The FHwA ROD discusses expansion capability as well: "[t]he project was conceived to provide more than a minimum facility and future expansion capability is an integral and important part of the overall development concept." FHwA ROD, at 5, FHwA Record, Vol. III, at 40.

 The central project goals identifiable in the present FEIS [52] contemplate an efficient marine dry cargo (containerized and neo-bulk) terminal in the Searsport area, to compete with modern dry cargo terminals in the region, capable of handling the kinds of cargo which would enhance the competitiveness of Maine industries, particularly the wood products industry and other basic Maine industries (e.g. agriculture and fishing). See FEIS, Vol. I, at 1–1. Although MDOT amply demonstrates that it "desires," see Federal Defendant's Supplemental Memorandum, at 61, a terminal facility capable of expansion to six berths,[53] unless its preferences bear a rational relationship to the technical and economic integrity of the project they would not warrant the exclusion of some otherwise "reasonable alternative" from analysis under NEPA.[54] A project's principal goals must override the stated preferences of the applicant for purposes of NEPA's "reasonable alternatives" analysis.

### b. Reasonableness of Two–Berth Alternatives

The economic and technical integrity of the project describes the matrix in which we measure the reasonableness of proffered alternatives. Agencies and courts must be alert to efforts, by project proponents and opponents alike, to skew the focus of the "reasonable alternatives" analysis by defining (or redefining) project purposes, rather than facilitating an informed evaluation of the competing environmental and developmental concerns implicated by the proposed project. An agency is not at liberty to decline to *evaluate* the particular proposal identified in the application, any more than the applicant is required to proceed with a project which is not of its own precise design. But an applicant is not entitled to insist, for example, that a terminal facility capable of ex-

---

**51.** Similarly, the affidavit of David Killoy, of the Corps, states,

From the earliest time that I had contact with the proposal for the Sears Island project while at CE Maguire, I understood the project to be for the purpose of establishing a competitive, regional port facility for the state of Maine with the capability to expand to meet future needs. I never understood there to be an intention to limit facility development to 2 berths.

Killoy Aff., at ¶ 10.

**52.** See text at pp. 62–63 & note 49 *supra.*

**53.** The Lawless affidavit states:

Commissioner Connors of MDOT, the project sponsor, [described] the project purpose....

[as the] provi[sion of] a modern and efficient port facility in the Central Maine Region with expansion potential up to six berths.

Lawless Aff., at ¶ 13.

**54.** In *Roosevelt Campobello,* the project proponent stated that "its basic consideration [in determining the site for an oil refinery and *deep water* terminal] was to find a port with deep water near shore in order to accommodate [very large crude carriers]." 684 F.2d at 1047. It was undisputed that "only by using such supertankers could [the proponent] take advantage of economies of scale, thereby making the project economically feasible." *Id.* Whether the agencies in the present case reasonably concluded that a two-berth facility would not satisfy MDOT's general goals is discussed below. *See* Section III.A.5.b. *infra.*

pansion to six berths is an integral feature of the project unless it is rational to conclude that a *nonexpandable* two-berth facility portending significantly less environmental injury is technically or economically unsuited to the project's core goals. *See CEQ Forty Questions*, 46 Fed.Reg. at 18026; *Roosevelt Campobello*, 684 F.2d at 1047.

Plaintiffs insist that a *nonexpandable* two-berth facility is a "reasonable alternative" because "sufficient information exists to indicate that a six-berth facility may not be necessary or even economically feasible." *Sierra Club*, 701 F.Supp. at 922. Plaintiffs point to the cargo projections of EPA's consultant, which concluded that Booz–Allen's (MDOT's consultant) cargo projections are flawed because they rely on unsupported assumptions as to vessel service, port costs and ocean costs. *See* TBS Review, at 5–7; Booz–Allen & Hamilton, Study of the Market Potential and Direct Benefits of New Port Development at Searsport, at 4, Plaintiffs' Appendix, at 245 (April 1987) (Booz–Allen study). Plaintiffs believe that their view draws some support from MDOT's own consultant, which concedes that "two berths are capable of handling all cargo in the low, medium and high [cargo volume] estimates" through the year 2010. Booz–Allen study, at 19.

MDOT argues that the present case is particularly analogous to *Roosevelt Cam-pobello*, in which only sites offering water deep enough to accommodate large supertankers were considered "reasonable alternatives" for NEPA purposes, because "[o]nly by using such supertankers could [the applicant] take advantage of economies of scale, thereby making the project economically feasible." 684 F.2d at 1047. MDOT maintains that, like deep water availability in *Roosevelt Campobello*, the "capacity of the proposed project to expand is a crucial factor in its ability to presently attract business and thus to be economically viable." MDOT's Opposition to Plaintiffs' Motion for Summary Judgment, at 32. MDOT relies on the affidavits of William Lawless and David Killoy of the Corps.

Mr. Lawless states:

In my professional opinion, the existence of a practicable alternative to the MDOT proposal turns upon the analysis of two major questions: The ability of a site to provide a facility competitive in the shipping industry from its inception and the existence of expansion capabilities at the site in order to remain competitive and meet increased demand. If the first question is not resolved positively in connection with a particular port, then the second issue becomes meaningless due to the failure of the port.

Lawless Aff., at ¶ 42.[55] Lawless then explained why he believes that the cargo projections submitted by MDOT's consultant,

---

**55.** Mr. Lawless explained his rationale as follows:

Because of the likelihood of changing conditions, in my opinion, projections for port usage extending beyond the year 2000, and any conclusions drawn therefrom, are imprecise and cannot be firmly depended upon as a predictor of success or failure. For that reason, I did not consider either BAH or TBS projections beyond that range as determinative in my review of the MDOT permit application and I applied my own experience in judging cargo and expansion projections. This included the following:

(a) In my professional experience, ports with competitively designed facilities generally experience expansion except in countries with a markedly declining economy. This condition does not apply to the state of Maine or the United States.

(b) In this particular case, my review of the materials submitted by various commenters indicated that there already was evidence of a demand for cargo facilities in the Searsport area to service cargo types either discounted or not included in the TBS studies. Such evidence included the stated desire by the Massachusetts Water Resources Authority (to Christine Godfrey, Project Manager) to use the proposed terminal for 100,000 cargo tons of woodchips per year for an estimated 50–year timeframe for its sewage sludge operations in the Boston area (Corps Record at 56); a statement by Champion International Corporation of its need for a modern container facility for its Maine paper plant operations (Corps Record at 17); and a letter from Bangor & Aroostook Railroad Company about the contacts it had received from companies interested in port facilities in Searsport, including one from Bowater Sales Company concerning the ability of a port to handle 100,000 tons of printing paper per year from its facilities in Brooklyn, Nova Scotia, possibly by Ro/Ro vessel, which shipments Bowater con-

Booz–Allen, are more reliable than those submitted by EPA's consultant, TBS.[56] Finally, Lawless evaluated and rejected TBS's contentions that the Mack Point alternative could handle forecasted cargo volumes at least through the year 2000.[57] Lawless carefully considered the economic

viability of a two-berth cargo terminal at Mack Point, including whether Mack Point could offer sufficient contiguous shoreland to support an efficient two-berth cargo terminal.[58]

The Killoy affidavit describes Mr. Killoy's comparative evaluation of the Booz–

> cluded could not be handled through existing Searsport facilities (Corps Record at 17).
>
> Lawless Aff., at ¶ 48.
>
> **56.** I reviewed the work done by TBS on this permit application and found that TBS did not challenge in substance the basic data in the cargo volume analysis done by BAH [Booz–Allen]. Instead, my review indicated that TBS *deleted certain types of anticipated cargos*, such as clay, without a reasonable basis for doing so; then, having so altered the analytical basis for narrowing the cargo groupings considered, TBS applied a different methodology than BAH in making its cargo projections. I did not consider this highly selective choice of potential cargo to be a valid approach in analyzing the issues presented by this permit application.
>
> My review of the BAH study indicated that their methods of analysis appeared sound and that there were no assumptions used in their analysis that, in my experience, were unreasonable to make in light of the nature of the project they were analyzing.
>
> The credibility of the BAH study was supported in part by the fact that I found that the methodology used by BAH was one frequently used by applicants for Corps' permits and accepted by the Corps as a valid approach to economic analysis.
>
> Lawless Aff., at ¶¶ 49–51.
>
> **57.** While TBS did conclude that, despite substantial physical limitations, it would be physically possible to locate a new 2–berth facility at Mack Point, nowhere did TBS reach a clearly stated professional conclusion that Mack Point was a practicable port facility site from daily operational or long-term economic viability viewpoints. In my opinion, the proposal that TBS argued was physically possible would be totally unable to provide the needed flexibility to adapt to any shift in cargo types. Thus, the TBS analysis reflected a redefinition of the project purpose set forth by MDOT. TBS used a time frame for its cargo projects and, hence, its analysis of the need for expandability of first the year 2000, and then 2010. I consider both of those time frames to be unacceptably short in terms of standard long-range port planning practices. I consider a minimum of 30 to 50 years to be an appropriate planning range for a permanent, regional facility.
>
> TBS was unable to state in its professional judgment that the proposal for Mack Point, even as it was developed and altered from MDOT's project purpose, could accommodate

> shipping cargos. TBS only stated that it *potentially* could handle shipments. I found TBS's inability to state unconditionally that a design could be achieved for Mack Point that would include foreseeable cargo handling to be an indication of TBS's own doubts about its analysis. Practicability requires an assurance that the alternative can achieve the basic project purpose.
>
> Lawless Aff., at ¶¶ 52–53 (emphasis in original).
>
> **58.** In reaching my own determination whether the 2–berth proposal was practicable at Mack Point, I focused *upon the validity of the short term cargo data and projections.* For purposes of a long term analysis, since the project was to be phased so that additional capacity would be built as market experience dictated, my opinion was that providing for the capacity of a 6–berth facility was reasonable in light of the scope of planning for similar types of ports in the technical port literature, and in light of general trends in cargo types and volumes.
>
> In my professional opinion, in order to justify the capital expenditures related to either substantial rehabilitation of a port or the construction of a new port, it is necessary to use a site which can provide both sufficient land area and proper land shape to meet forecasted short term needs as well as to adapt to differing cargo types and potential increases in cargo volumes.
>
> The above are cost and logistical consideration (sic) which I considered to be within the scope of the Corps' analysis in the permitting process and which I applied to the analysis of the MDOT application.
>
> In my professional opinion, the alternative involving the use of Mack Point as the port site is not practicable even at a 2–berth design because it does not meet the planning standards discussed above. This is due to the lack of contiguous shoreland available for efficient loading, unloading, and storage purposes. The configuration at Mack Point would create an inefficiency that would result in longer handling times, additional handling requirements, greater costs of handling, and less flexibility in the different types of cargo which could be handled through the port. In my experience, these are factors which are crucial to whether a port can be successful. A port facility designed and built with such great inherent limitations upon its efficiency would discourage potential customers from using it even in its earliest years.

Allen and TBS reports, and it articulates a reasoned basis for his conclusion that Booz–Allen's work is more compelling.[59] Mr. Killoy explained the specific bases for the conclusion that Mack Point would not be a practicable alternative:

> In my professional opinion, the efficiency of a port's "turn-around" time—*i.e.*, its ability to get a ship in and out of port quickly—is the key to the economic viability of a port because shippers will send their business to the most efficient port available. If it is successful, expandibility (sic) is necessary to assure continuing success.

Killoy Aff., at ¶ 16. Mr. Killoy concluded that even a two-berth facility would not be practicable at Mack Point due to the spatial and configurative constraints of Mack Point.[60]

As recognized in *Sierra Club,* 701 F.Supp. at 923, "the role of the court is not to determine which expert to believe, TBS or Booz–Allen," but rather to determine whether the agency decision not to evaluate an alternative site was "arbitrary and capricious." The discussion of alternatives "is the heart of the EIS." *CEQ Forty Questions,* 46 Fed.Reg. at 18028. "The purpose is not merely to force the *agency* to reconsider its proposed action, but, more broadly, to inform ... other agencies[ ] and the general public about the environmental consequences of a certain action in order to spur all interested parties to rethink the wisdom of the action." *Natural Resources Defense Council, Inc. v. Hodel,* 865 F.2d 288, 296 (D.C.Cir.1988). The "touchstone for [the court's] inquiry is whether an EIS's *selection and discussion* of alternatives fosters informed decision-making and informed public participation." *California v. Block,* 690 F.2d 753, 767 (9th Cir.1982) (emphasis added). The EIS need set forth "only those alternatives necessary to permit a 'reasoned choice.'" *California v. Block,* 690 F.2d at 767 (citing *Save Lake Washington v. Frank,* 641 F.2d 1330, 1334 (9th Cir.1981); *Life of Land v. Brinegar,* 485 F.2d 460, 472 (9th Cir.1973), *cert. denied,* 416 U.S. 961, 94 S.Ct. 1979, 40 L.Ed. 2d 312 (1974)).

■ The carefully considered and reasoned conclusions in the Lawless and Killoy affidavits, as well as the Booz–Allen study, establish a rational basis for the agency

---

Lawless Aff., at ¶¶ 54–57.

**59.** In reviewing the BAH and TBS reports, I specifically examined the issues of port economy and operations, including port design information and cargo projections, for purposes of assessing the practicability of alternatives to the Sears Island project.

In general, in my opinion, the BAH report was wider in scope and presented a much more detailed and thorough analysis of the Sears Island project and its alternatives than did the TBS report. The BAH report analyzed the concept of port development from a regional port viewpoint, whereas the TBS report focused on whether it was physically possible to put a facility equivalent to Phase I at Sears Island (*i.e.,* 2 berths) at Mack Point.

I found that both the BAH and TBS reports were within the standards of good practice in assessing port operations. However, it was obvious to me that the question the two studies were addressing was not the same. The BAH report addressed the state of Maine's need to site and size an efficient, competitive port that would provide this service into the foreseeable future. This is a broad scope with detailed analysis of what is needed at the port site to achieve these ends. The TBS report was very limited in scope, in that it assessed only whether a 2–berth port at Mack Point could physically be built and function to handle the cargos proposed for Sears Island, not whether it would necessarily be efficient or competitive. In addition, the TBS report did not address whether such a port facility could be expanded, if necessary.

Killoy Aff., at ¶¶ 13–15.

**60.** Based upon my experience in port design and construction, I concluded that Mack Point was specifically impracticable as an alternative to MDOT's Sears Island project, even as a 2–berth facility, because the physical configuration of the backland meant that large cargo would have to be broken up and dispersed for storage; this would require more sophisticated and complex cargo tracking and cargo moving systems and more travel time. The more complex a system is to operate, the more likely it is that errors and costly delays will occur. At Mack Point, the physical configuration of the site is such that the backland is fragmented because of fuel tanks and railroad lines. The pier facility is limited as well, unless additional filling is undertaken. As a result, Mack Point has no real ability even at 2 berths to handle neo-bulk or containerized cargo because of the physical constraints of the site, in contrast to a facility at Sears Island. *A port could not be constructed at Mack Point which had the same efficiency and capacity as the project proposed at Sears Island.* Killoy Aff., at ¶ 17 (emphasis added).

decision not to provide more detailed analysis of a two-berth terminal at Mack Point.[61] The data and analyses in these materials demonstrate a reasonable basis for concluding that Mack Point is not a practicable site for a technically efficient and economically viable *nonexpandable* two-berth facility, let alone an expandable one. The decision to exclude from consideration a *nonexpandable* two-berth terminal at Mack Point is rationally supported on this basis alone.

There is ample basis in the administrative record, without any reference to *post hoc* submissions, to support elimination of the "no action" alternative. *See, e.g.,* FEIS, Vol. I, at 2–1 to 2–2 (explaining that without a cargo terminal Maine's future needs for a modern cargo facility would be met by out-of-state ports and that even without a cargo terminal Sears Island is likely to become industrialized). The record is devoid of credible evidence that anything *less than* a nonexpandable two-berth terminal would fulfill the *core* objectives of the project—a technically efficient and economically viable modern marine dry cargo terminal in the Searsport area.

Accordingly, the court upholds the agency decision not to undertake more detailed analysis of the alternative of a *nonexpandable* two-berth terminal facility at *Mack Point.*

■ The agency decision not to evaluate the reasonableness of a *nonexpandable* two-berth facility *on Sears Island* presents a far more difficult question. On the one hand, it would appear sound business practice to design and locate a modern terminal with a view to its capacity to accommodate supportably-anticipated cargo types and volume *throughout* the useful life of the facility. Yet the exercise of forecasting cargo volumes 40 to 50 years into the future must be considered problematic, if not speculative, at best. Should the reasonableness of an alternative be measured against such concededly problematic long-range cargo volume forecasts? *See, e.g.,* note 55 *supra.*

The most serious concern that emerges upon a careful consideration of the entire record in these proceedings, and from the history of the "donnybrook" litigation it has spawned, is that MDOT's selection of a two-berth facility, *expandable to six berths,* may be less a function of its prudent accommodation of the economic and technical requirements of the project than a convenient vehicle for rendering impracticable any Searsport area site *except Sears Island.* Plaintiffs repeatedly charge that the federal agencies have not acted in good faith in fulfilling their responsibilities under NEPA, as evidenced in part by the failure to evaluate reasonable alternatives to an *expandable* two-berth facility, and that such reasonable alternatives must be evaluated before the federal defendants (and the public) can make the *informed* choice and judgment envisioned by NEPA.

The court concludes that there has been no showing of lack of good faith on the part of the federal agencies in carrying out their responsibilities under NEPA. The elimination of Mack Point as a reasonable alternative site for the proposed project simply does not depend on whether the terminal is expandable beyond two berths; the federal agencies rationally determined that Mack Point cannot even accommodate a technically efficient and economically viable two-berth *nonexpandable* facility. There is no need whatever to gild this lilly with fanciful projections supporting a facility expandable to three berths, much less six.

Furthermore, the court is satisfied that it is rational to make provisional allowance for future growth and change through site

---

**61.** Appendix A of the FEIS evaluates the appropriateness of the three alternative sites in the Searsport area. It states that "[c]onstruction of an efficient, modern cargo port facility would seriously disrupt operations presently located at Mack Point"; that Mack Point has limited ability to induce secondary development because practically all land available on Mack Point would be devoted to actual terminal uses and "land suitable for industrial development does not offer ready access to Mack Point"; that some contiguous upland is available for terminal support facilities but restoration of existing operations or sacrifices in performance capabilities of the cargo terminal will be required; and that there is no area available for future expansion unless present uses are relocated. FEIS, Vol. I, at A–12.

selection and facility design decisions *during the planning stage.* There are sound economic and technical reasons for designing and locating port facilities, in particular, with a view to their possible future expansion and technological adaptation. Port facilities require large capital investments, the economic soundness of which will be affected importantly by the efficiency of the facility throughout its useful life. In addition there are spatial and configurative requirements that result not only from the dimensions and placement of the terminal facility proper, but from the necessity for efficient cargo handling and storage facilities, and from the need to consider operational economies of anticipated satellite facilities such as industrial parks.

The court concludes that plaintiffs are not likely to prevail on the merits of their NEPA claim that the federal agencies failed to evaluate Mack Point as a reasonable alternative site for a *nonexpandable* two-berth terminal. Notwithstanding that the plaintiffs have not shown that the federal defendants lacked good faith in carrying out their NEPA responsibilities, the plaintiffs are likely to succeed on their NEPA claim that the federal defendants violated NEPA by failing to *evaluate* the alternative of a two-berth Sears Island terminal *expandable* to less than six berths.[62]

### B. *Irreparable Harm*

#### 1. Causal Connection between NEPA Violation and Uninformed Agency Decision

Plaintiffs have demonstrated a likelihood of success on the merits of five NEPA claims: (1) violation of the NEPA regulations relating to use of outside contractors; (2) inadequate secondary impact analysis; (3) "arbitrary and capricious" agency decisions not to prepare supplemental EIS; (4)

inadequate evaluation of reasonable alternatives; and (5) the ineffectual Corps adoption of inadequate FHwA FEIS.[63] The entire administrative record has been examined with a view to whether any NEPA violation resulted in inadequate agency awareness of significant environmental consequences of the project.

#### a. *Use of Consultants*

 Plaintiffs have shown a likelihood of success on the merits of their claims that the FHwA violated NEPA by not obtaining conflict of interest disclosure statements from the outside consultants hired to prepare the EIS, i.e., Normandeau Associates and ERA, and that the FEIS is deficient because its table of preparers does not list the consulting firms which prepared significant background papers, i.e., Booz–Allen, HBA and Olko Engineering.

The administrative record reveals that the Corps and the FHwA were cognizant that Booz–Allen, HBA and Olko Engineering prepared significant EIS *background papers* and assisted in other aspects of the EIS process. *See, e.g.,* FHwA Record, Vol. I, at 28 (scoping meeting transcript reflecting that Booz–Allen was under contract to update an earlier study and that the EIS preparers "intend[ed] to make full use of [Booz–Allen's] current work in the description, justification and need for [the] port facility"); FEIS, Vol. I, at X (summarizing reports prepared by Booz–Allen); *id.* at § 12 (listing all reports prepared by Booz–Allen and HBA); FHwA Record, Vol. I, at 19 (notes of meeting attended by representatives of FHwA, HBA and Booz–Allen); *id.* Vol. II, at 12 (notes of discussion among representatives of FHwA and Corps concerning decision to commission HBA and Olko Engineering to prepare terminal designs for Mack Point); Corps Record, Vol.

---

**62.** Plaintiffs claim also that the Corps improperly adopted the FEIS. The governing regulation states that "[a]n agency may adopt a Federal draft or final environmental impact statement ... provided the statement ... meets the standards for an adequate statement under these regulations." 40 C.F.R. § 1506.3(a). Plaintiffs have demonstrated a likelihood of success on their NEPA claims that the FEIS does not address adequately the reasonably foreseeable sec-

ondary impacts of the proposed project and that the FEIS does not discuss all reasonable alternatives to the proposed project. Therefore, there exists a likelihood that the plaintiffs will prevail on the merits of their NEPA claim that the Corps improperly adopted the FEIS.

**63.** The fifth NEPA claim is not discussed separately, because it does not cause distinct injury.

II, at 27 (responses of Booz–Allen, HBA and Olko Engineering to Corps questions concerning project design); Richardson Aff. at ¶ 46 (discussing review of minutes of conferences among HBA and owners of industrial facilities on Mack Point); FHwA's Record, Vol. II, at 17 (notes of meeting of FHwA and Corps comparing Booz–Allen and TBS cargo projections).

The Corps and the FHwA were well aware also that HBA, Olko Engineering and Normandeau Associates had been hired by MDOT to perform studies relating to the Sears Island cargo terminal prior to the decision in *Sierra Club I.* *See, e.g.,* Richardson Aff. at ¶ 52 ("In 1985, at the time the EIS process began, I was well aware that [HBA] and Olko Engineering continued in their roles as project designers, and were then engaged in final design and construction engineering work on the project."); *id.* ¶¶ 48, 51, 52 (Volume 3 of HBA's 1983 report on the Sears Island cargo terminal is an environmental study prepared by Normandeau Associates which later formed the basis of the 1983 Sears Island EA); Corps Record, Vol. I, at 1A (Corps EA re September 17, 1984 permit, later vacated, citing HBA 1983 Design Report, Normandeau Associates' Environmental Assessment and Normandeau Associates' Revised Environmental Assessment).[64]

Finally, much of this information was available to the cooperating environmental agencies, as well as the Sierra Club, all of which carefully scrutinized the EIS process from its inception. *See, e.g.,* FEIS Vol. I, at X, 1–6, 1–7 (summarizing various Booz–Allen studies); *id.* at A–18 to A–29, A–43 (detailed comparison of alternative port designs citing HBA reports on terminal design); *id.* at 12–2, 12–6 ("Literature Cited" section listed all reports prepared by Booz–Allen and HBA); FHwA Record, Vol. I, at 28, p. 14 (transcript of scoping meeting attended by EPA, Sierra Club and FWS,

stating that HBA "has the contract to design the cargo terminal site and also do the construction engineering on the project.").

The NEPA regulations on outside contractors are not "pointless technicalities" which agencies are free to ignore, *Grazing Fields Farm v. Goldschmidt,* 626 F.2d at 1073; they are intended to protect the "integrity of the NEPA process," *CEQ Forty Questions,* 46 Fed.Reg. at 18031. On the other hand, NEPA violations constitute cognizable harm only if they affect an agency decisionmaker's "opportunity to adequately review environmental factors," *Association Concerned About Tomorrow, Inc. v. Dole,* 610 F.Supp. 1101, 1119 (N.D. Tex.1985), or the public's capacity to comment on the EIS, *Sierra Club III,* at 503. Plaintiffs have not demonstrated a likelihood that the information available to agency decisionmakers would have been qualitatively superior but for these violations of the NEPA regulations on the use of outside contractors.

Since it does not appear that the integrity of the NEPA process was compromised, or that more satisfactory compliance with these NEPA regulations would improve the quality of the available information, the record cannot support a finding that these lapses left agency decisionmakers with an inadequate awareness of the environmental consequences of their decision. Absent such a showing, the court finds no likelihood of harm either to the physical environment or otherwise.

#### b. *Secondary Impacts*

▮ Plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the FEIS analysis of secondary impacts is inadequate. NEPA is purely a procedural statute which directs agency decisionmakers to consider all significant environmental effects of the proposed project before determining upon a course of action. *Sierra Club III,* at 502. The EIS is intended to " 'provide decision

---

**64.** Although the Corps EA does not state specifically that the Corps knew that Olko Engineering assisted with HBA's Design Report, considering the fact that Olko Engineering was listed on the cover pages of HBA's 1983 Design Report and technical appendices, *see* Plaintiffs' Supplemen-

tal Appendix, at 84; Corps Record, Vol. E4, at 5, the court finds, as a practical matter, that the Corps' knowledge of HBA's prior involvement necessarily subsumed knowledge of Olko Engineering's prior work on the project in behalf of HBA.

makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in light of its environmental consequences' [and to] 'provide the public with information and an opportunity to participate in gathering information.' " *Methow Valley Citizens Council v. Regional Forester*, 833 F.2d 810, 814 (9th Cir.1987) (citations omitted), *rev'd on other grounds sub nom., Robertson v. Methow Valley Citizens Council*, — U.S. —, 109 S.Ct. 1835, 104 L.Ed.2d 351; *see Robertson v. Methow Valley Citizens Council*, — U.S. at —, 109 S.Ct. at 1844 (An EIS "ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.") The harm flowing from a NEPA violation is the added risk posed to the environment, *Sierra Club III*, at 500. When a NEPA violation deprives agency decisionmakers of information, analysis or comment necessary to an informed awareness of the likely environmental effects of their decisions. *Id.*

The record before the court evidences the following consideration of the secondary impacts of the Sears Island project. According to the notes of a February 11, 1986 meeting, attended by the Corps, FHwA and MDOT, the "issue of Secondary Impacts was discussed in detail." FHwA Record, Vol. II, at 13. A formal decision was reached that earlier proposals for development of the island, i.e., a nuclear power plant, a coal-fired power plant and an aluminum smelter, could be excluded from EIS secondary impact analysis on the ground that, even if these industries were to locate on Sears Island, their location would not have been "made possible by the [Sears Island project] and impossible without." *Id.* ERA was directed to prepare a special report focusing on industries "which are reasonably foreseeable and made possible by the action and not possible without it." *Id.* ERA was directed to analyze and summarize the Mallar Report, the "Sears Island Land Use Plan," prepared for BIC, and "other information [which] is available," and "come up with a plan that can be reasonably attributed to the port project for the foreseeable future." *Id.* The ERA Special Report has not been made available in these proceedings.

The FHwA's consideration of secondary impacts appears to have been limited as indicated in the following unexplicated statements from the affidavit of William Richardson:

> With respect to the question of the secondary impacts to be analyzed, the actual selection of the industries discussed in the final EIS was based upon the 1983 report prepared by Mallar Development Services, Inc. for the Town of Searsport, Maine, entitled "A Municipal Response Plan for the Industrial Development of Sears Island." I reviewed that report and the MDOT rational (sic) for the selection for (sic) the four industries to be considered under secondary impacts. I discussed the issue with Ronning and Mattson and I decided that the approach was reasonable.

Richardson Aff., at ¶ 22.

Although it was entirely reasonable to discuss the four "target" industries, the record does not support the conclusion that forest and food product industries, and perhaps other *non* light-dry industries (except the power generation and aluminum smelter industries), are not reasonably foreseeable tenants whose location at the industrial park would be fairly attributable to the Sears Island project. *See* discussion at § II.A.3 *supra*. Nothing in the present record demonstrates that the Corps or the FHwA considered, much less evaluated, the possible environmental effects of food and/or forest product industry tenants, or other *non* light-dry industrial (other than power generation and aluminum smelter) tenants, locating in (or near) the industrial park.

There is a clear risk that the agency decision to approve the Sears Island project was made without the information, analysis

or comment necessary to an informed awareness of the likely secondary impacts of the challenged action. *See Sierra Club III*, at 500.

### c. *Supplemental EIS*

■ The plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the FHwA and the Corps "arbitrarily and capriciously" decided not to issue a supplemental EIS.

The plaintiffs claim that the revised estimate of the onshore acreage required for the terminal facility is significant new information which required the preparation of a supplemental EIS to explore the environmental consequences of utilizing approximately 50 additional onshore acres for the terminal. The only evidence before the court relating to agency consideration of the revised acreage estimate are statements contained in the affidavits submitted by William Lawless, Chief of the Regulatory Branch of the Operations Division of the Corps New England Division, and by William Richardson, FHwA Division Administrator, to the effect that they examined MDOT's responses (which included the revised acreage estimates) to the Corps Twenty Questions, and concluded that MDOT's responses were based on data previously submitted, and presented no new information calling for a supplemental EIS, *see* Lawless Aff., at ¶ 33; Richardson Aff., at ¶ 44. There is no indication in the administrative record as to what led Richardson and Lawless to believe that the new acreage information would not significantly alter the environmental picture presented in the FEIS.

The court must now determine whether this NEPA violation deprived agency decisionmakers of information, analysis or comment necessary to an informed awareness of the likely environmental effects of their decision.

Agency decisionmakers and other interested parties, as well as the public, had before them an analysis of the type of habitat likely to be impacted by the acreage required for a *nonexpandable* two-berth terminal. The FEIS evaluates the environmental impacts of a cargo terminal requiring 40.3 upland acres and 32.4 filled acres, plus an industrial park of 160 upland acres. In connection with the 40.3 acres of upland habitat evaluated in connection with the cargo *terminal*, the FEIS states that "practically all of the habitat loss would be hardwood and mixed hardwood spruce forests, the two most abundant types on the island." FEIS, Vol. I, at 4–6. The FEIS characterizes the habitat at the proposed *industrial* park as "primarily second growth forest, namely hardwood dominated forest, mixed-hardwood-spruce forest and softwood-dominated forest." FEIS, Vol. I, at 4–114. An affidavit submitted by Ron Elder of MDOT states that "[t]he need for additional land [for the cargo terminal] ... *could* be provided due to the proximity of the planned industrial park...." Elder Aff., at ¶ 10 (emphasis added). The FEIS discussion on the environmental effects of the cargo terminal and industrial park includes an evaluation of the percentage of each type of habitat affected by the *combined* cargo terminal and industrial park. *See, e.g.*, FEIS Vol. I, at 4–4 (cargo terminal will impact 10% of the hardwood dominated forest, 4% of the mixed hardwood-spruce forest, 5% of the total island habitat); *id.* at 4–115 ("The loss of 65 acres [of habitat] due to the industrial park plus another 50± acres for new roads and rail access (the highest estimate) represents less than about 12% of the island's total upland habitat.") The FEIS states that the "aggregate loss of habitat is not expected to threaten the continued existence of any wildlife species on Sears Island, since about 80% of the island would not be affected by the project." *Id.* at 4–155.

Agency decisionmakers had before them the information necessary to enable an informed decision of the likely environmental consequences of the construction and operation of a *nonexpandable* two-berth terminal facility, but not of a terminal expandable to more than two berths. The FEIS analyzed the environmental effects of a terminal facility occupying *32.4* filled acres (including *9.1* acres of intertidal and *23.3* acres of subtidal lands) and *40.3* acres of onshore uplands, or a total of 72.7 acres.

On the basis of the revised acreage estimates, a *nonexpandable* two-berth facility would occupy a total of 68 "onshore acres," which appears to include the required intertidal and subtidal lands to be filled and the necessary upland acreage as well.[65] The FEIS analyzes the environmental effects of an industrial park which would occupy 160 acres. There has been no revision of the acreage requirements of the industrial park itself.

The environmental harm which NEPA seeks to prevent is the additional risk posed to the environment by uninformed decision-making, *Sierra Club III*, at 500, and a resultant agency commitment to its uninformed decision. There is a likelihood that agency decisionmakers approved an *expandable* two-berth terminal facility without the information, analysis and comment necessary for an informed decision. Although the agency decisionmakers in this instance were not deprived of information, analysis or comment necessary to an informed decision as to the environmental effects of constructing and operating a *nonexpandable* two-berth terminal facility, together with a 160–acre industrial park, they did not have the requisite information concerning the likely environmental effects associated with a three-berth, much less a six-berth, facility. It appears that construction and operation of the terminal will cause a complete loss of wildlife habitat and carrying capacity for every acre utilized, *see* FEIS, Vol. I, at 2–20, whereas the FEIS anticipates that only 65 acres of wildlife habitat will be eliminated by the 160–acre industrial park, *id.* at 4–115.

### d. *Reasonable Alternatives*

■ The plaintiffs have demonstrated a likelihood of success on the merits of their NEPA claim that the FEIS discussion of reasonable alternatives is inadequate. The court finds that the federal agency defendants rationally concluded that *Mack Point* lacked the requisite spatial and configurative characteristics to support a modern and efficient *nonexpandable* two-berth dry

cargo terminal, *see* Lawson Aff., ¶¶ 52–53; Killoy Aff., at ¶ 16; *see generally* § II.A.5. *supra*, and that the agency decision not to undertake more detailed analysis of a *nonexpandable* two-berth terminal facility *on Sears Island* [*nonexpandable* facility] was rationally related to essential project purposes. However, the agency acted "arbitrarily and capriciously" by failing to undertake detailed analysis of a two-berth terminal facility *expandable* to less than six berths [*partially* expandable facility] *on Sears Island,* as a reasonable alternative to the proposed two-berth Sears Island terminal expandable to six berths [*fully* expandable facility].

The court now examines whether the failure to evaluate a *partially* expandable Sears Island terminal, as an alternative to a *fully* expandable facility, deprived agency decisionmakers of information, analysis or comment necessary to an informed awareness of the likely environmental effects of their decision.

The FEIS analysis of likely environmental effects is based primarily on the construction of a *fully* expandable terminal, although portions of the marine impacts discussion distinguish the impacts expected to attend the construction of the first two terminal berths from those anticipated in connection with a *fully* expanded six-berth terminal. *See* FEIS, Vol. I, at 4–1 ("In all cases, impacts relate to the full development of the terminal unless specifically stated otherwise"); *id.* at 4–44 (initial development of the terminal will impact 9.1 acres of intertidal and 15.2 acres of subtidal area, full development will impact no additional intertidal area and 8.1 acres of subtidal area). After the FEIS had been approved, MDOT's consultants revised their estimates of the number of "onshore" acres required for a two, four, and six berth terminal. The FEIS analyzed the environmental effects of a terminal requiring a total of 72.7 onshore acres, made up of 32.4 filled intertidal and subtidal acres and 40.3 acres of uplands. According to

---

**65.** The FEIS states that a two-berth facility would require 9.1 intertidal and 15.2 subtidal acres.

the revised estimates, a two-berth facility would require 68 onshore (includes upland and filled acres) a four-berth facility 100 acres, and a six-berth facility 124 acres. Corps Record, Vol. II, at 27.

Therefore, it appears that agency decisionmakers had before them the information necessary to enable an informed consideration of the likely environmental consequences of a *nonexpandable*, but not a *partially* or *fully* expandable, Sears Island terminal facility. *See* section II, B.1.a.iii *supra*. In addition to not presenting decisionmakers with sufficient information on the environmental effects of a *partially* or *fully* expandable Sears Island terminal, the FEIS does not provide sufficient information to enable decisionmakers or the public to make an informed judgment as to whether a *fully* expandable terminal is economically necessary or viable, or whether the economic benefits of a *fully* expandable facility would be worth the additional environmental costs. *See South Louisiana Environmental Council, Inc. v. Sand*, 629 F.2d 1005, 1011 (5th Cir.1980) ("In order to fully appraise the potential environmental harms of a proposed project, they must be weighed against the economic benefits of that project.") *Accord Sierra Club I*, 769 F.2d at 876 ("Relevant decision makers may well find that the project's economic good outweighs any environmental harm.")

Although the FEIS does not enable an informed choice between project alternatives, also available to the agency decisionmakers were Booz–Allen's cargo projections, the EPA, FWS and Sierra Club objections to those projections, and the TBS critique of Booz–Allen's projections. *See* Richardson Aff., at ¶ 46(h)–(1) (TBS studies "personally reviewed" by Richardson); Lawson Aff., at ¶ 49 (reviewed "the work done by TBS"); Killoy Aff., at ¶ 13 (reviewed TBS reports); FHwA Record, Vol. III, at 15 (meeting to discuss feasibility of Mack Point alternative attended by FHwA, Corps, EPA, Town of Searsport, MDOT and TBS). The Booz–Allen Reports, complemented by the EPA, FWS, Sierra Club and TBS critiques, gave agency decisionmakers sufficient information, and comment, to make an informed decision as to whether future cargo volume would justify a *partially* or *fully* expandable terminal. However, because agency decisionmakers did not have sufficient information (or comment) as to the likely environmental effects of a *partially* or a *fully* expandable Sears Island terminal, they were unable to make an informed comparison of the economic benefits of each alternative with its environmental costs, or to compare the costs and benefits of one alternative with another.

There is a substantial risk that the agency decision to approve a two-berth Sears Island terminal facility, *expandable* to six berths, was made without the information, analysis or comment necessary to an informed awareness of all reasonable alternatives.

### 2. Bureaucratic Commitment

The court now turns to whether any bureaucratic commitment resulting from agency approval of the Sears Island project, without full awareness of its secondary impacts, reasonable alternatives and its environmental effects, constitutes irreparable harm. The inquiry involves three subsidiary questions: whether irreparable physical harm to the environment is likely absent a preliminary injunction; whether the NEPA violations led to an insufficiently informed agency decision; and whether, in light of all of the circumstances, it appears more likely that recourse to the NEPA process would "prove an exercise in futility" if the project is not enjoined than if the project is enjoined while recourse is had to the NEPA process. *See* note 7 *supra*.

#### a. *Irreparable Physical Harm to Environment*

Unless enjoined from doing so, MDOT intends to proceed with the next phases of construction: completion of the pier access road and installation of eleven steel pier cells and connecting arcs. Plaintiffs contend that further construction will result in irreparable harm to the physical

# 588

environment.[66]

The 500' pier access road extends from the proposed onshore site of the terminal to the proposed site of the pier cell nearest the shore. The road "will consist of an earthen embankment roadway," with a 50' wide travel lane. Norris Aff., at ¶ 7. Plans call for filter fabric over the fill and "riprap" slope, to protect against erosion. *Id.* The road will cover approximately two acres of submerged land, less than one acre being within the intertidal zone. *Id.;* Barry Supplemental Aff. at 6. Ten of the eleven pier cells will be connected by arcs. "The connecting cell and arc structure will be 70 feet in diameter and 810 feet in length, running parallel to the shoreline of Sears Island." Barry Supplemental Aff., at ¶ 7. One cell will be freestanding. *Id.* All cells and arcs will be filled. *Id.* The eleven cells and arcs will cover approximately one and one-quarter acres of subtidal land, none of which is in the intertidal zone. *Id.,* Norris Aff., at ¶ 10.

The defendants contend that there will be no irreparable physical harm to the environment from pier cell and pier access road construction. Defendants argue that the access road and pier cells together will affect less than one acre of intertidal land and approximately three acres of subtidal land, Barry Supplemental Aff., at ¶¶ 6-7, and that the organisms inhabiting the affected area are common to Penobscot Bay and the Maine coast generally, *id.* at ¶¶ 9-10. Defendants concede that construction will have an impact on water quality due to fill placement and disruption of muddy sed-

iments in the area of cell installation, but they argue that these effects will be temporary and "should not result in the elevation of the contaminant levels in the water due to the fact that the level of contamination of the sediments off Sears Island has been observed to be low." *Id.* at ¶¶ 12-13. The defendants concede that there is a "theoretical[ ]" possibility that summer season construction could disturb lobsters during the critical molting period, but argue that lobsters are rare in the immediate vicinity of the project. *Id.* at ¶ 14. Finally, defendants concede that the pier access road and the pier cells will cause a permanent *change* in the environment by "creating some areas in which sediment will be deposited and some areas from which it will be carried away." *Id.* at ¶ 15. But they argue that the area affected contains no rare, endangered or uncommon species of flora or fauna, and that due to the "low energy environment" (except in storms) there should be "no unusual sedimentation problems in the short term." *Id.*

From the present record it appears that irreparable physical *change* to the environment would result from construction of the pier access road and the pier cells. Although "environmental change is not necessarily tantamount to injury, much less *irreparable* injury," *Sierra Club,* 701 F.Supp. at 899 (emphasis in original), the affected area contains resources which are of some regional and state significance. *See* Plaintiffs' Appendix, at 154–64 (Penob-

**66.** MDOT interposes the equitable doctrine of laches as a bar to injunctive relief against further construction, on the ground that plaintiffs delayed their challenge to MDOT's plans to proceed with the next phase of construction, as outlined in its letter of March 8, 1989. Ltr. from Thomas Reeves, MDOT Chief Counsel, to Clerk, March 8, 1989.

In their motion for a preliminary injunction, filed on August 10, 1988, plaintiffs sought to enjoin MDOT "from proceeding with the Sears Island project unless and until the Federal Defendants have complied ... with [NEPA]." The motion for preliminary injunctive relief was not restricted to causeway construction and harbor dredging. Rather, the court itself restricted its focus to the causeway construction and harbor dredging, inasmuch as these were the only phas-

es of the construction project to be undertaken immediately. *Sierra Club,* 701 F.Supp. at 897 n. 16.

Not only is laches "a disfavored defense in environmental cases," *Concerned Citizens on I-90,* 641 F.2d 1, 7–8 (1st Cir.1981), it is entirely inapposite where, as here, plaintiffs seek to enjoin the entire project, but fail in the first instance to obtain preliminary injunctive relief against the initial phases of the project. In these circumstances there simply is no just basis for attributing unreasonable delay to the plaintiffs or, for that matter, reasonable reliance on the part of the defendants. *See NAACP v. Legal Defense & Education Fund,* 753 F.2d 131, 136–37 (D.C.Cir.), *cert. denied,* 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985).

scot Bay Conservation Plan).[67] Unlike the earlier causeway construction and harbor dredging, no defendant offers evidence that it would be practicable to remove either the pier access road or the pier cells and connecting arcs, or that restoration of the affected environment would result.

Although on the present record irreparable physical harm to the environment is clearly possible, plaintiffs have not shown that any such physical harm to the environment would be causally connected to a *NEPA violation*. Therefore, plaintiffs are unlikely to succeed on any contention that a NEPA violation would cause irreparable *physical* harm to the environment.

b. *Likelihood of Irreparable Environmental Harm from Uninformed Decisionmaking*

In considering whether any increased bureaucratic commitment resulting from a NEPA violation is likely to constitute irreparable harm the court must consider whether the NEPA violation led to an insufficiently informed agency decision which "the law permits" the agency to make in its unconstrained discretion; that is, with respect to which the court "cannot force the agency to choose a new course of action."[68] *Sierra Club III*, at 500, 503 (parentheses omitted).

NEPA "declares a broad national commitment to protecting and promoting environmental quality." *Methow Valley*, — U.S. at —, 109 S.Ct. at 1844 (citing NEPA, 42 U.S.C. § 4332). The EIS serves

NEPA's "action-forcing purpose" in two ways: "It ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts[,] [and] it ... guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and implementation of that decision." *Id.* Although it includes "action forcing" provisions, essentially NEPA is a *"purely* procedural statute." *Sierra Club III*, at 502 (emphasis in original). By "focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Methow Valley*, — U.S. at —, 109 S.Ct. at 1845. But once the "adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id.* See Sierra Club III*, at 502 ("As long as the decisionmaker has fully considered the environmental impacts of the proposed action, NEPA does not stop him from then deciding to cause environmental damage"). *But cf.* notes 4 & 68 *supra.*

The court has found that the federal defendants acted "arbitrarily and capriciously": by limiting the EIS secondary impact analysis to the four industries tar-

---

**67.** The proposed site of the Sears Island cargo terminal lies within a class B habitat. *See* Plaintiffs' Appendix, at 163. "Class B habitat should be maintained in sufficient quantity and quality to support all indigenous wildlife species and should not experience change in existing use, although an increase in the intensity of use is approved." *Sierra Club*, 701 F.Supp. at 898 n. 18 (citing Penobscot Bay Conservation Plan, at 25).

Construction will affect approximately one acre of intertidal wetlands. From a "national perspective," the filling of wetlands is "considered to be among the most severe environmental impacts" covered by the EPA guidelines. 40 C.F.R. § 230.1(d). The EPA has announced that the "guiding principle should be that degradation or destruction of special aquatic sites [such as wetlands] may represent an irrevocable

loss of valuable aquatic resources." *Id.; see also* 33 C.F.R. § 320.4(b) (Corps CWA regulation stating that "[M]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to public policy.")

**68.** In light of this court's previously-stated concern that *Sierra Club III* may not have considered the effect of the pending CWA claim on the *Watt–Village of Gambell* analysis, *see* note 4 *supra*, the court makes the provisional finding that, insofar as "wetlands" are concerned, the present NEPA violations would not result in irreparable *physical* harm to the environment in the absence of preliminary injunctive relief, since the CWA does not permit agency decisionmakers to cause unnecessary harm to "wetlands." *See Sierra Club III*, at 500, 503.

geted in the Mallar Report; by failing to prepare a supplemental EIS; and by failing to consider a *partially* expandable terminal facility *on Sears Island* as an alternative to the *fully* expandable Sears Island terminal proposed by MDOT. *See* Sections II. A.3., II.A.4. & II.A.5. *supra.* The court further found that these NEPA violations probably led to insufficiently informed agency decisions to permit and fund the Sears Island project.

c. *Risk of Bureaucratic Commitment*

■ In light of all of the circumstances (including earlier Sears Island project proceedings), the court considers whether recourse to the NEPA process (aimed at curing procedural deficiencies) is *more likely* to "prove an exercise in futility," *Sierra Club III,* at 503, (in the sense of bringing "about a new choice," *id.,* fairly arrived at in light of the newly obtained information, analysis and/or comment) if the project *is not enjoined,* than would be the case if the project *is enjoined, while* further proceedings are continuing. *But cf.* notes 4 & 68 *supra.*

In *Sierra Club III* the First Circuit vacated the denial of plaintiffs' motion for a preliminary injunction despite the absence of any showing of irreparable physical injury to the environment. *Sierra Club III,* at 499. "A district court ... must realize the important fact of administrative life that ..., as time goes on, it will become ever more difficult to undo an improper decision (a decision that, in the presence of adequate environmental information, might have come out differently)." *Id.* at 503. Although "risk of bureaucratic commitment" is not readily susceptible of empiri-

cal proof or quantification, the court understands *Sierra Club III* to say that "risk of bureaucratic commitment" may cause real harm to the environment where, as under NEPA, the court may not compel the agency to reach a different *result,* but may only compel agency *reconsideration* of its earlier decision in light of the *new* information acquired through recourse to the NEPA process. The First Circuit observed that the manner in which this type of potentially irreparable "harm arises may well have to do with the psychology of decisionmakers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built." *Sierra Club III,* at 504. Because NEPA's goal is to minimize the *"risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment," *id.* at 500 (emphasis in original), it is "perfectly proper" for courts to consider the "difficulty of stopping a bureaucratic steam roller," *id.* at 504, and the "practical fact that bureaucratic decisionmakers (where the law permits) are less likely to tear down a nearly completed project than a barely started project," *id.* Nevertheless, even though a NEPA violation carries with it the risk that the environment may be harmed through inadequately informed decisionmaking, it appears that the risk of bureaucratic commitment does not necessarily result in *irreparable* harm. *See Sierra Club III,* at 504 ("[C]ourts should take account of [the] harm [from inadequately informed decisionmaking] and its potentially 'irreparable' nature.") [69]

**69.** In *Wisconsin v. Weinberger,* the Seventh Circuit recognized that NEPA's purpose "will not be fully achieved if decisionmakers are predisposed to favor a particular outcome because of an agency's investment in the project" and that "[s]uch a predisposition can result once a commitment of resources to a project is undertaken...." 745 F.2d 426–27. But in that case the Seventh Circuit found that the Navy's decision to *expand* the original project came in 1981, when earlier plans to expand, previously placed on hold by the Carter administration, were approved by the Reagan administration. The Navy's commitment, "largely in terms of research and development dollars, was well es-

tablished by the time plaintiffs got around to filing their lawsuit in mid–1983." *Id.* at 427. The Seventh Circuit held that because "the commitment entailed by the remaining construction effort" was "relatively small," an "injunction's service to NEPA in preserving unbiased decisionmaking would be slight." *Id.* at 427. *Accord Northern Cheyenne Tribe,* 851 F.2d at 1156–57 (district court did not abuse discretion by amending injunction so as to suspend, rather than void, oil leases, because Ninth Circuit saw "no reason to suppose that the [decisionmaker] would feel greater commitment to the original project if the leases were not voided but held in

The defendants argue that the risk of increased bureaucratic commitment is minimal because these federal decisionmakers are not advocates or proponents of the project and therefore have no interest in the outcome. The defendants note that the project proposal at issue in *Watt* was conceived and carried out solely by the federal government and that the project was expected to generate substantial revenue, whereas in the present case the federal defendants did not conceive the project, nor do they stand to derive direct benefit, their only role being to process the application and determine whether or not to approve the project.[70]

Unlike *Weinberger, see* note 69 *supra,* this proceeding involves an attempt to enjoin the resumption of construction on a project in circumstances where the largest portion of the construction costs has yet to be committed. If construction of the Sears Island project were allowed to continue, by the time a decision has been reached on the merits MDOT would have expended approximately $4,700,000 on the causeway and harbor dredging,[71] Hunter Aff., at ¶ 5, $752,025 on the pier access road, Spinney Aff. (April 12, 1989), at ¶ 9, and at least $6,598,277 on the eleven pier cells, *id.* at ¶ 10. With the completion of each addition-

al phase of the construction, agency decisionmakers may be more disposed to adhere to their earlier uninformed decision, rather than to entertain and fairly consider new information that might point to "a new and different course of action." *Sierra Club III,* at 503. The court recognizes "the practical *fact* that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project rather than a barely started project." *Id.* at 500–501 (emphasis added).

### C. *Balance of Harms*

██ Although courts are to recognize the risk of real environmental harm due to "inadequately informed decisionmaking," and its potentially irreparable nature, a likely NEPA violation does not "automatically" call for preliminary injunctive relief; "the *balance* of harms may point the other way." *Sierra Club III,* at 503–504 (emphasis in original) (quoting *Watt,* 716 F.2d at 952). The defendants contend that the risk of harm from any NEPA violation would be outweighed by the harm which would be caused to MDOT (and others interested in the project) if construction is halted. Indeed, MDOT has demonstrated that delays occasioned by a preliminary injunction would entail substantial additional costs.[72]

---

abeyance until a new evaluation [was] made....")

**70.** The First Circuit stated that government agencies may become committed to a project in part because of the time, resources and psychological commitments of third parties. *See Watt,* 716 F.2d at 952 (finding successful oil companies' commitment of "time and effort" to planning and development of leaseholds "a link in a chain of bureaucratic commitment"); *Sierra Club III,* at 504–505 (intimating that resident, worker and business attachment to the causeway and port development as the project nears completion are factors for court to consider).

**71.** On August 27, 1988, Robert Hunter of HBA, the consulting firm under contract to MDOT for professional engineering services in connection with the Sears Island project, stated:

There are five basic contracts for construction of the terminal, each of which must be closely coordinated with the others. These contracts are:

Contract IA—Dredging—Est. Value Aug. Award $ 3,700,000

| | |
|---|---|
| Contract 2—Marine Construction Est. Value Aug. Award | $ 9,810,000 |
| Contract 3—Shore Side Facilities Est. Current Value | 2,800,000 |
| Causeway Construction—Est. Current Value | 1,000,000 |
| Engineering Contract—Est. Current Value | 1,900,000 |
| Total Value | $19,210,000 |

Hunter Aff., at ¶ 5.

**72.** If construction of the pier access road is halted before it is "substantially complete," a "fair estimate" of the damages occasioned by delay is said to be between $92,455 and $132,-455. Affidavit of Ralph P. Norris, at ¶ 9.

On April 25, 1989, MDOT authorized the general contractor for the pier cell construction to begin moving personnel from Florida to Searsport, ship equipment, ready on-site equipment, and secure arrangements with subcontractors. Ltr. from Thomas Reeves, MDOT Chief Counsel, April 28, 1989. Costs of contract demobilization are estimated to run as high as $300,000. Norris Aff. at ¶ 13. Additionally, MDOT submits

The court may consider increased project costs which would result from a preliminary injunction, where, as here, it does not appear that "adequate compensatory relief will be available in the course of the litigation." *California ex rel. Van De Camp v. Tahoe Regional Planning Association,* 766 F.2d 1316, 1319 (9th Cir.1985). On the other hand, environmental harm, by its nature, is long-lasting and seldom adequately remedied by monetary damages. *See Village of Gambell,* 480 U.S. at 545, 107 S.Ct. at 1403. Therefore, if environmental harm appears sufficiently likely, the balance of harms usually weighs in favor of an injunction. *Id.* Under NEPA, unless defendants assert that an injunction will cause imminent harm to national defense, *Weinberger,* 745 F.2d at 433, the impending bankruptcy of an entire industry, *Louisiana ex rel Guste v. Lee,* 635 F.Supp. 1107, 1128 (E.D. La.1986), or the bankruptcy of innocent third parties, *Sierra Club v. Penfold,* 664 F.Supp. 1299, 1306 (D.Alaska 1987), the balance of harms usually favors the issuance of an injunction to protect the environment.[73]

The record demonstrates a depressed Waldo County (including Searsport) area economy at the time the FEIS was approved. One important purpose of the Sears Island project is to stimulate economic activity and employment in the area. The record does not substantiate, however, a likelihood of the kind or magnitude of irreparable economic harm involved in *Lee* or *Penfold.* In those cases, the pursuit of *extant* economic opportunities, including jobs in the troubled mining and shell dredging industries, was enjoined in response to environmental considerations. In the present case, while recourse to the NEPA process surely will occasion further delay, following that delay the presently *non-*

*existent* (but anticipated) economic benefits of the project, including jobs, will either be lost due to a new and different agency decision, made in light of all of the environmental effects of the project, *or the anticipated* economic benefits will be pursued notwithstanding the environmental effects.

The balance of harms favors preliminary injunctive relief pending a decision on the merits.

### D. *Public Interest*

■■■ Finally, the court considers whether preliminary injunctive relief would adversely affect the public interest. In its earlier denial of preliminary injunctive relief, the court held that

> [g]iven plaintiffs' inability to post meaningful security, the *absence* of any likelihood of irreparable injury to any plaintiff or of *irreparable permanent injury to the environment* they seek to protect, and, therefore, the absence of any significant basis for delaying a project which offers substantial local and state-wide economic benefits, the court finds that the public interest weighs heavily against preliminary injunctive relief.

*Sierra Club,* 701 F.Supp. at 900 (footnote omitted) (emphasis added).

Although the defendants contend otherwise, the finding that irreparable harm is likely to result from bureaucratic bias plainly affects the public interest analysis. NEPA is intended to strike a balance between man's social, economic and technical needs and the nation's environmental resources. *See* 42 U.S.C. § 4331(a) (congressional declaration of national environmental policy). NEPA implements a *legislative determination* that the public interest is served by ensuring that agency decisionmakers have before them "an analysis

---

that delays in commencement of pier cell installation could result in contract cost increases ranging between $150,000 and $200,000. *Id.*

**73.** Even in *Penfold* and *Lee* the courts granted modified injunctive relief. In *Penfold,* the court held that since the loss of even one season would force some miners, who had already made irretrievable financial commitments, to file for bankruptcy, the current mining season would be allowed to continue, but that mining in future seasons would be enjoined pending NEPA compliance. 664 F.Supp. at 1306. Similarly, in *Lee* the court balanced the almost certain destruction of the Louisiana shell dredging industry against the harm likely to occur to the already significantly damaged environment, and allowed the existing permit to continue but enjoined its renewal or extension. 635 F.Supp. at 1129.

(with prior public comment) of the likely effects of their decision upon the environment," *Sierra Club III*, at 500. Absent a showing that environmental harm is likely if an injunction *does* issue, *see American Motorcyclist Association v. Watt*, 714 F.2d 962, 966–67 (9th Cir.1983); *Alpine Lakes Protection Society v. Schlapfer*, 518 F.2d 1089, 1090 (9th Cir.1975), or that an injunction would cause other public hazards, *see Piedmont Heights Civil Club, Inc. v. Moreland*, 637 F.2d 430, 443 (5th Cir.1981) (serious traffic and safety hazards from overcrowded highway), or that significant irreparable harm would be caused to innocent third parties, *see Penfold*, 664 F.Supp. at 1306, the public interest is not adversely affected by enjoining actions likely to cause irreparable environmental harm, *see Conservation Law Foundation v. Watt*, 560 F.Supp. 561, 583 (D.Mass.) ("It is plain that the public interest calls upon the courts to require strict compliance with environmental statutes"), *aff'd sub nom. Commonwealth of Massachusetts v. Watt*, 716 F.2d 946, 953 (1st Cir.1983) ("The district court's weighing of the public interest and its conclusions thereon were ... well within its sound discretion."); *Manatee County v. Gorsuch*, 554 F.Supp. 778, 795–96 (M.D. Fla.1982) ("The public has an interest in seeing that Government officials carry out their [environmental] responsibilities"). *See Sierra Club III*, at 503–504 ("Congress, in enacting NEPA explicitly took note of one way in which governments can harm the environment (through inadequately informed decisionmaking); ... courts should take account of this harm and its potentially 'irreparable' nature").

The public interest is better served by a preliminary injunction that ensures maintenance of the *status quo* pending agency recourse to the NEPA process established by Congress to assure that decisionmakers are fully informed of the significant environmental effects of the proposed Sears Island project.

### CONCLUSION

Plaintiffs having satisfied each of the criteria for preliminary injunctive relief, the court concludes that a preliminary in-junction shall issue suspending all further project construction pending compliance with NEPA.